St. John DIXON et al., Appellants,

v.

ALABAMA STATE BOARD OF EDUCATION et al., Appellees.

No. 18641.

United States Court of Appeals Fifth Circuit.

Aug. 4, 1961.

Jack Greenberg, Thurgood Marshall, New York City, Fred D. Gray, Montgomery, Ala., Derrick A. Bell, Jr., New York City, for appellants, James M. Nabrit, III, New York City, of counsel.

Gordon Madison, Asst. Atty. Gen. of Ala., MacDonald Gallion, Atty. Gen. of Ala., Robt. P. Bradley, Governor's Office, Montgomery, Ala., for appellees.

Before RIVES, CAMERON and WISDOM, Circuit Judges.

RIVES, Circuit Judge.

The question presented by the pleadings and evidence,[1] and decisive of this appeal, is whether due process requires notice and some opportunity for hearing before students at a tax-supported college are expelled for misconduct. We answer that question in the affirmative.

The misconduct for which the students were expelled has never been definitely specified. Defendant Trenholm, the President of the College, testified that he did not know why the plaintiffs and three additional students were expelled and twenty other students were placed on probation. The notice of expulsion[2]

[1.] The complaint alleges that "Defendant Trenholm on March 4, 1960, notified plaintiffs of their expulsion effective March 5, 1960, without any notice, hearing, or appeal," and further avers:

"Expulsion from Alabama State College came without warning, notice of charges, opportunity to appear before defendants or at any other hearing, opportunity to offer testimony in defense, cross-examination of accusers, appeal, or other opportunity to defend plaintiffs' right not to be arbitrarily expelled from defendant College. Defendants' expulsion order, issued by the defendants functioning under the statutes, laws and regulations of the State of Alabama, thereby deprived plaintiffs of rights protected by the due process clause of the Fourteenth Amendment to the United States Constitution."

To this averment the defendants respond:

"* * * that the facts set forth in plaintiffs' complaint show no violation of the due process clause of the Fourteenth Amendment to the Constitution of the United States; that plaintiffs have no constitutional right to attend Alabama State College; that the facts stated by plaintiffs in their complaint show that this Court is without jurisdiction for no arbitrary action is alleged except as conclusions unsupported by the facts alleged; that the defendants determined in good faith and within their authority as the governing authorities of Alabama State College that the expulsions of the plaintiffs were for the best interests of the college and based upon undisputed conduct of plaintiffs while students at said college."

As will appear later in this opinion, the issue thus squarely presented by the pleadings was fully developed in the evidence.

[2.] Letter from Alabama State College, Montgomery, Alabama, dated March 4, 1960, signed by H. Councill Trenholm, President:

"Dear Sir:

"This communication is the official notification of your expulsion from Alabama State College as of the end of the 1960 Winter Quarter.

"As reported through the various news media, The State Board of Education considered this problem of Alabama State College at its meeting on this past Wednesday afternoon. You were one of the students involved in this expulsion-directive by the State Board of Education. I was directed to proceed accordingly.

"On Friday of last week, I had made the recommendation that any subsequently-confirmed action would not be effective until the close of this 1960 Winter Quarter so that each student could thus have the opportunity to take this quarter's ex-

which Dr. Trenholm mailed to each of the plaintiffs assigned no specific ground for expulsion, but referred in general terms to "this problem of Alabama State College."

The acts of the students considered by the State Board of Education before it ordered their expulsion are described in the opinion of the district court reported in 186 F.Supp. 945, 947, from which we quote in the margin.[3]

As shown by the findings of the district court, just quoted in footnote 3, the only demonstration which the evidence showed that *all* of the expelled students took part in was that in the lunch grill located in the basement of the Montgomery County Courthouse. The other

aminations and to qualify for as much OH–Pt credit as possible for the 1960 Winter Quarter.

"The State Board of Education, which is made responsible for the supervision of the six higher institutions at Montgomery, Normal, Florence, Jacksonville, Livingston, and Troy (each of the other three institutions at Tuscaloosa, Auburn and Montevallo having separate boards) includes the following in its regulations (as carried in page 32 of The 1958–59 Registration-Announcement of Alabama State College):

" 'Pupils may be expelled from any of the Colleges:

" 'a. For willful disobedience to the rules and regulations established for the conduct of the schools.

" 'b. For willful and continued neglect of studies and continued failure to maintain the standards of efficiency required by the rules and regulations.

" 'c. For Conduct Prejudicial to the School and for Conduct Unbecoming a Student or Future Teacher in Schools of Alabama, for Insubordination and Insurrection, or for Inciting Other Pupils to Like Conduct.

" 'd. For any conduct involving moral turpitude.' "

In the notice received by each of the students paragraph "c," just quoted, was capitalized.

3. "On the 25th day of February, 1960, the six plaintiffs in this case were students in good standing at the Alabama State College for Negroes in Montgomery, Alabama * * * On this date, approximately twenty-nine Negro students, including these six plaintiffs, according to a prearranged plan, entered as a group a publicly owned lunch grill located in the basement of the county courthouse in Montgomery, Alabama, and asked to be served. Service was refused; the lunchroom was closed; the Negroes refused to leave; police authorities were summoned; and the Negroes were ordered outside where they remained in the corridor of the courthouse for approximately one hour. On the same date, John Patterson, as Governor of the State of Alabama and as chairman of the State Board of Education, conferred with Dr. Trenholm, a Negro educator and president of the Alabama State College, concerning this activity on the part of some of the students. Dr. Trenholm was advised by the Governor that the incident should be investigated, and that if he were in the president's position he would consider expulsion and/or other appropriate disciplinary action. On February 26, 1960, several hundred Negro students from the Alabama State College, including several if not all of these plaintiffs, staged a mass attendance at a trial being held in the Montgomery County Courthouse, involving the perjury prosecution of a fellow student. After the trial these students filed two by two from the courthouse and marched through the city approximately two miles back to the college. On February 27, 1960, several hundred Negro students from this school, including several if not all of the plaintiffs in this case, staged mass demonstrations in Montgomery and Tuskegee, Alabama. On this same date, Dr. Trenholm advised all of the student body that these demonstrations and meetings were disrupting the orderly conduct of the business at the college and were affecting the work of other students, as well as work of the participating students. Dr. Trenholm personally warned plaintiffs Bernard Lee, Joseph Peterson and Elroy Embry, to cease these disruptive demonstrations immediately, and advised the members of the student body at the Alabama State College to behave themselves and return to their classes. * * *

"On or about March 1, 1960, approximately six hundred students of the Alabama State College engaged in hymn singing and speech making on the steps of the State Capitol. Plaintiff Bernard Lee addressed students at this demonstration, and the demonstration was attended by several if not all of the plaintiffs. Plaintiff Bernard Lee at this time called on the students to strike and boycott the college if any students were expelled because of these demonstrations."

demonstrations were found to be attended "by several if not all of the plaintiffs." We have carefully read and studied the record, and agree with the district court that the evidence does not affirmatively show that *all* of the plaintiffs were present at any but the one demonstration.

Only one member of the State Board of Education assigned the demonstration attended by all of the plaintiffs as the sole basis for his vote to expel them. Mr. Harry Ayers testified:

"Q. Mr. Ayers, did you vote to expel these negro students because they went to the Court House and asked to be served at the white lunch counter? A. No, I voted because they violated a law of Alabama.

"Q. What law of Alabama had they violated? A. That separating of the races in public places of that kind.

"Q. And the fact that they went up there and requested service, by violating the Alabama law, then you voted to have them expelled? A. Yes.

"Q. And that is your reason why you voted? A. That is the reason."

The most elaborate grounds for expulsion were assigned in the testimony of Governor Patterson:

"Q. There is an allegation in the complaint, Governor, that—I believe it is paragraph six, the defendants' action of expulsion was taken without regard to any valid rule or regulation concerning student conduct and merely retaliated against, punished, and sought to intimidate plaintiffs for having lawfully sought service in a publicly owned lunch room with service; is that statement true or false?

"A. Well, that is not true; the action taken by the State Board of Education was—was taken to prevent—to prevent incidents happening by students at the College that would bring—bring discredit upon—upon the School and be prejudicial to the School, and the State—as I

said before, the State Board of Education took—considered at the time it expelled these students several incidents, one at the Court House at the lunch room demonstration, the one the next day at the trial of this student, the marching on the steps of the State Capitol, and also this rally held at the church, where —where it was reported that—that statements were made against the administration of the School. In addition to that, the—the feeling going around in the community here due to—due to the reports of these incidents of the students, by the students, and due to reports of incidents occurring involving violence in other States, which happened prior to these things starting here in Alabama, all of these things were discussed by the State Board of Education prior to the taking of the action that they did on March 2 and as I was present and acting as Chairman, as a member of the Board, I voted to expel these students and to put these others on probation because I felt that that was what was in the best interest of the College. And the—I felt that the action should be—should be prompt and immediate, because if something— something had not been done, in my opinion, it would have resulted in violence and disorder, and that we wanted to prevent, and we felt that we had a duty to the—to the—to the parents of the students and to the State to require that the students behave themselves while they are attending a State College, and that is (sic) the reasons why we took the action that we did. That is all."

Superintendent of Education Stewart testified that he voted for expulsion because the students had broken rules and regulations pertaining to all of the State institutions, and, when required to be more specific, testified:

"The Court: What rule had been broken is the question, that justi-

fied the expulsion insofar as he is concerned?

"A. I think demonstrations without the consent of the president of an institution."

The testimony of other members of the Board assigned somewhat varying and differing grounds and reasons for their votes to expel the plaintiffs.

The district court found the general nature of the proceedings before the State Board of Education, the action of the Board, and the official notice of expulsion given to the students as follows:

"Investigations into this conduct were made by Dr. Trenholm, as president of the Alabama State College, the Director of Public Safety for the State of Alabama under directions of the Governor, and by the investigative staff of the Attorney General for the State of Alabama.

"On or about March 2, 1960, the State Board of Education met and received reports from the Governor of the State of Alabama, which reports embodied the investigations that had been made and which reports identified these six plaintiffs, together with several others, as the 'ring leaders' for the group of students that had been participating in the above-recited activities. During this meeting, Dr. Trenholm, in his capacity as president of the college reported to the assembled members of the State Board of Education that the action of these students in demonstrating on the college campus and in certain downtown areas was having a disruptive influence on the work of the other stu-

dents at the college and upon the orderly operation of the college in general. Dr. Trenholm further reported to the Board that, in his opinion, he as president of the college could not control future disruptions and demonstrations. There were twenty-nine of the Negro students identified as the core of the organization that was responsible for these demonstrations. This group of twenty-nine included these six plaintiffs. After hearing these reports and recommendations and upon the recommendation of the Governor as chairman of the Board, the Board voted unanimously, expelling nine students, including these six plaintiffs, and placing twenty students on probation. This action was taken by Dr. Trenholm as president of the college, acting pursuant to the instructions of the State Board of Education. Each of these plaintiffs, together with the other students expelled, was officially notified of his expulsion on March 4th or 5th, 1960.[4] No formal charges were placed against these students and no hearing was granted any of them prior to their expulsion."

"[4] [Same as footnote 2, supra, of this opinion.]"

Dixon v. Alabama State Board of Education, D.C.M.D.Ala.1960, 186 F.Supp. 945, 948, 949.

The evidence clearly shows that the question for decision does not concern the sufficiency of the notice or the adequacy of the hearing, but is whether the students had a right to any notice or hearing whatever before being expelled.[4]

4. The plaintiff Dixon testified:
"Q. Now on that day—from February 25 until the date that you received your letter of expulsion, which you have already identified, will you tell the Court whether any person at the College gave you any official notice that your conduct was unbecoming as a student of Alabama State College? A. No.
"Q. Did the president or any other person at the College arrange for any

type of hearing where you had an opportunity to present your side prior to the time you were expelled? A. No.
"Q. Your answer was no? A. No."
The testimony of Governor Patterson, Chairman of the State Board of Education, was in accord:
"Q. Did the State Board of Education, prior to the time it expelled the plaintiffs, give them an opportunity to appear either before the College or before the

The district court wrote at some length on that question, as appears from its opinion. Dixon v. Alabama State Board of Education, supra, 186 F.Supp. at pages 950–952. After careful study and consideration, we find ourselves unable to agree with the conclusion of the district court that no notice or opportunity for any kind of hearing was required before these students were expelled.

It is true, as the district court said, that " * * * there is no statute or rule that requires formal charges and/or a hearing * * *," but the evidence is without dispute that the usual practice at Alabama State College had been to give a hearing and opportunity to offer defenses before expelling a student. Defendant Trenholm, the College President, testified:

"Q. The essence of the question was, will you relate to the Court the usual steps that are taken when a student's conduct has developed to the point where it is necessary for the administration to punish him for that conduct?

"A. We normally would have conference with the student and notify him that he was being asked to withdraw, and we would indicate why he was being asked to withdraw. That would be applicable to academic reasons, academic deficiency, as well as to any conduct difficulty.

Board in order to present their sides of this pic—of this incident? A. No, other than receiving the report from Dr. Trenholm about it.

"Q. Did the Board direct Dr. Trenholm to give the students formal notice of why they were expelled? A. No, the Board—the Board passed a resolution instructing Dr. Trenholm to expel the students and put twenty on probation, and Dr. Trenholm carried that out."

State Superintendent of Education Stewart testified:

"Q. Were these students given any type of hearing, or were formal charges filed against them before they were expelled? A. They were—Dr. Trenholm expelled the students; they weren't given any hearing.

"Q. And at this hearing ordinarily that you would set, then the student would have a right to offer whatever defense he may have to the charges that have been brought against him?

"A. Yes."

Whenever a governmental body acts so as to injure an individual, the Constitution requires that the act be consonant with due process of law. The minimum procedural requirements necessary to satisfy due process depend upon the circumstances and the interests of the parties involved. As stated by Mr. Justice Frankfurter concurring in Joint Anti-Fascist Refugee Committee v. McGrath, 1951, 341 U.S. 123, 163, 71 S.Ct. 624, 644, 95 L.Ed. 817:

"Whether the *ex parte* procedure to which the petitioners were subjected duly observed 'the rudiments of fair play', * * * cannot * * be tested by mere generalities or sentiments abstractly appealing. The precise nature of the interest that has been adversely affected, the manner in which this was done, the reasons for doing it, the available alternatives to the procedure that was followed, the protection implicit in the office of the functionary whose conduct is challenged, the balance of hurt complained of and good accomplished—these are some of the considerations that must enter into the judicial judgment."

"Q. No hearing? A. I don't think they would be given a hearing in any of our schools in this State; if they couldn't behave themselves, I think they should go home.

"Q. Do you—were they warned at all prior to expulsion? A. Not as I know of; I can't answer that question. Dr. Trenholm was in the meeting, and that afternoon after the Board meeting, he was given the—the decision, and he was the one who took action.

"Q. When the State Board of Education expels a student, is there any possibility of appeal or any opportunity for him to present his side of the story? A. I never have heard of it."

Just last month, a closely divided Supreme Court held in a case where the governmental power was almost absolute and the private interest was slight that no hearing was required. Cafeteria and Restaurant Workers Union v. McElroy et al., 1961, 81 S.Ct. 1743. In that case, a short-order cook working for a privately operated cafeteria on the premises of the Naval Gun Factory in the City of Washington was excluded from the Gun Factory as a security risk. So, too, the due process clause does not require that an alien never admitted to this Country be granted a hearing before being *excluded*. United States ex rel. Knauff v. Shaughnessy, 1950, 338 U.S. 537, 542, 543, 70 S.Ct. 309, 94 L.Ed. 317. In such case the executive power as implemented by Congress to *exclude* aliens is absolute and not subject to the review of any court, unless expressly authorized by Congress. On the other hand, once an alien has been admitted to lawful residence in the United States and remains physically present here it has been held that, "although Congress may prescribe conditions for his expulsion and deportation, not even Congress may expel him without allowing him a fair opportunity to be heard." Kwong Hai Chew v. Colding, 1953, 344 U.S. 590, 597, 598, 73 S.Ct. 472, 478, 97 L.Ed. 576.

It is not enough to say, as did the district court in the present case, "The right to attend a public college or university is not in and of itself a constitutional right." 186 F.Supp. at page 950. That argument was emphatically answered by the Supreme Court in the Cafeteria and Restaurant Workers Union case, supra, [81 S.Ct. 1748.] when it said that the question of whether " * * * summarily denying Rachel Brawner access to the site of her former employment violated the requirements of the Due Process Clause of the Fifth Amendment * * * cannot be answered by easy assertion that, because she had no constitutional right to be there in the first place, she was not deprived of liberty or property by the Superintendent's action. 'One may not have a constitu-tional right to go to Bagdad, but the Government may not prohibit one from going there unless by means consonant with due process of law.' " As in that case, so here, it is necessary to consider "the nature both of the private interest which has been impaired and the governmental power which has been exercised."

The appellees urge upon us that under a provision of the Board of Education's regulations the appellants waived any right to notice and a hearing before being expelled for misconduct.

"Attendance at any college is on the basis of a mutual decision of the student's parents and of the college. Attendance at a particular college is voluntary and is different from attendance at a public school where the pupil may be required to attend a particular school which is located in the neighborhood or district in which the pupil's family may live. Just as a student may choose to withdraw from a particular college at any time for any personally-determined reason, the college may also at any time decline to continue to accept responsibility for the supervision and service to any student with whom the relationship becomes unpleasant and difficult."

We do not read this provision to clearly indicate an intent on the part of the student to waive notice and a hearing before expulsion. If, however, we should so assume, it nonetheless remains true that the State cannot condition the granting of even a privilege upon the renunciation of the constitutional right to procedural due process. See Slochower v. Board of Education, 1956, 350 U.S. 551, 555, 76 S.Ct. 637, 100 L.Ed. 692; Wieman v. Updegraff, 1952, 344 U.S. 183, 191, 192, 73 S.Ct. 215, 97 L.Ed. 216; United Public Workers of America (C.I.O.) v. Mitchell, 1947, 330 U.S. 75, 100, 67 S.Ct. 556, 91 L.Ed. 754; Shelton v. Tucker, 1960, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231. Only private associations have the right to obtain a waiver of notice and hearing before depriving

a member of a valuable right. And even here, the right to notice and a hearing is so fundamental to the conduct of our society that the waiver must be clear and explicit. Medical and Surgical Society of Montgomery County v. Weatherly, 75 Ala. 248, 256–259. In the absence of such an explicit waiver, Alabama has required that even private associations must provide notice and a hearing before expulsion. In Medical and Surgical Society of Montgomery County v. Weatherly, supra, it was held that a physician could not be expelled from a medical society without notice and a hearing. In Local Union No. 57, etc. v. Boyd, 1944, 245 Ala. 227, 16 So.2d 705, 711, a local union was ordered to reinstate one of its members expelled after a hearing of which he had insufficient notice.

The precise nature of the private interest involved in this case is the right to remain at a public institution of higher learning in which the plaintiffs were students in good standing. It requires no argument to demonstrate that education is vital and, indeed, basic to civilized society. Without sufficient education the plaintiffs would not be able to earn an adequate livelihood, to enjoy life to the fullest, or to fulfill as completely as possible the duties and responsibilities of good citizens.

There was no offer to prove that other colleges are open to the plaintiffs. If so, the plaintiffs would nonetheless be injured by the interruption of their course of studies in mid-term. It is most unlikely that a public college would accept a student expelled from another public college of the same state. Indeed, expulsion may well prejudice the student in completing his education at any other institution. Surely no one can question that the right to remain at the college in which the plaintiffs were students in good standing is an interest of extremely great value. .

Turning then to the nature of the governmental power to expel the plaintiffs, it must be conceded, as was held by the district court, that that power is not unlimited and cannot be arbitrarily exercised. Admittedly, there must be some reasonable and constitutional ground for expulsion or the courts would have a duty to require reinstatement. The possibility of arbitrary action is not excluded by the existence of reasonable regulations. There may be arbitrary application of the rule to the facts of a particular case. Indeed, that result is well nigh inevitable when the Board hears only one side of the issue. In the disciplining of college students there are no considerations of immediate danger to the public, or of peril to the national security, which should prevent the Board from exercising at least the fundamental principles of fairness by giving the accused students notice of the charges and an opportunity to be heard in their own defense. Indeed, the example set by the Board in failing so to do, if not corrected by the courts, can well break the spirits of the expelled students and of others familiar with the injustice, and do inestimable harm to their education.

The district court, however, felt that it was governed by precedent, and stated that, "the courts have consistently upheld the validity of regulations that have the effect of reserving to the college the right to dismiss students at any time for any reason without divulging its reason other than its being for the general benefit of the institution." [186 F. Supp. 951.] With deference, we must hold that the district court has simply misinterpreted the precedents.

The language above quoted from the district court is based upon language found in 14 C.J.S. Colleges and Universities § 26, p. 1360, which, in turn, is paraphrased from Anthony v. Syracuse University, 224 App.Div. 487, 231 N.Y. S. 435, reversing 130 Misc.2d 249, 223 N.Y.S. 796, 797. (14 C.J.S. Colleges and Universities § 26, pp. 1360, 1363 note 70.) This case, however, concerns a private university and follows the well-settled rule that the relations between a student and a private university are a matter of contract. The Anthony case held that the plaintiffs had specifically

waived their rights to notice and hearing. See also Barker v. Bryn Mawr, 1923, 278 Pa. 121, 122 A. 220. The precedents for public colleges are collected in a recent annotation cited by the district court. 58 A.L.R.2d 903–920. We have read all of the cases cited to the point, and we agree with what the annotator himself says: "The cases involving suspension or expulsion of a student from a public college or university all involve the question whether the hearing given to the student was adequate. In every instance the sufficiency of the hearing was upheld." 58 A.L.R.2d at page 909. None held that no hearing whatsoever was required. Two cases not found in the annotation have held that some form of hearing is required. In Commonwealth ex rel. Hill v. McCauley, 1886, 3 Pa.Co.Ct.R. 77, the court went so far as to say that an informal presentation of the charges was insufficient and that a state-supported college must grant a student a full hearing on the charges before expulsion for misconduct. In Gleason v. University of Minnesota, 1908, 104 Minn. 359, 116 N.W. 650, on reviewing the overruling of the state's demurrer to a petition for mandamus for reinstatement, the court held that the plaintiff stated a prima facie case upon showing that he had been expelled without a hearing for alleged insufficiency in work and acts of insubordination against the faculty.

The appellees rely also upon Lucy v. Adams, D.C.N.D.Ala.1957, 134 F.Supp. 235, where Autherine Lucy was expelled from the University of Alabama without notice or hearing. That case, however, is not in point. Autherine Lucy did not raise the issue of an absence of notice or hearing.

It was not a case denying any hearing whatsoever but one passing upon the adequacy of the hearing,[5] which provoked from Professor Warren A. Seavey of Harvard the eloquent comment:

"At this time when many are worried about dismissal from public service, when only because of the overriding need to protect the public safety is the identity of informers kept secret, when we proudly contrast the full hearings before our courts with those in the benighted countries which have no due process protection, when many of our courts are so careful in the protection of those charged with crimes that they will not permit the use of evidence illegally obtained, our sense of justice should be outraged by denial to students of the normal safeguards. It is shocking that the officials of a state educational institution, which can function properly only if our freedoms are preserved, should not understand the elementary principles of fair play. It is equally shocking to find that a court supports them in denying to a student the protection given to a pickpocket."

*Dismissal of Students: "Due Process,"* Warren A. Seavey, 70 Harvard Law Review 1406, 1407. We are confident that precedent as well as a most fundamental constitutional principle support our holding that due process requires notice and some opportunity for hearing before a student at a tax-supported college is expelled for misconduct.

For the guidance of the parties in the event of further proceedings, we state our views on the nature of the notice and hearing required by due process prior to expulsion from a state college or university. They should, we think, comply with the following standards. The notice should contain a statement of the specific charges and grounds which, if proven, would justify expulsion under the regulations of the Board of Education. The nature of the hearing should vary depending upon the circumstances of the particular case. The case before us requires something more than an informal interview with an administrative authority of the college. By its nature, a charge of misconduct, as op-

---

5. People ex rel. Bluett v. Board of Trustees of University of Illinois, 10 Ill.App. 2d 207, 134 N.E.2d 635, 58 A.L.R.2d 899.

posed to a failure to meet the scholastic standards of the college, depends upon a collection of the facts concerning the charged misconduct, easily colored by the point of view of the witnesses. In such circumstances, a hearing which gives the Board or the administrative authorities of the college an opportunity to hear both sides in considerable detail is best suited to protect the rights of all involved. This is not to imply that a full-dress judicial hearing, with the right to cross-examine witnesses, is required. Such a hearing, with the attending publicity and disturbance of college activities, might be detrimental to the college's educational atmosphere and impractical to carry out. Nevertheless, the rudiments of an adversary proceeding may be preserved without encroaching upon the interests of the college. In the instant case, the student should be given the names of the witnesses against him and an oral or written report on the facts to which each witness testifies. He should also be given the opportunity to present to the Board, or at least to an administrative official of the college, his own defense against the charges and to produce either oral testimony or written affidavits of witnesses in his behalf. If the hearing is not before the Board directly, the results and findings of the hearing should be presented in a report open to the student's inspection. If these rudimentary elements of fair play are followed in a case of misconduct of this particular type, we feel that the requirements of due process of law will have been fulfilled.

The judgment of the district court is reversed and the cause is remanded for further proceedings consistent with this opinion.

Reversed and remanded.

CAMERON, Circuit Judge (dissenting).

The opinion of the district court in this case [1] is so lucid, literate and moderate that I cannot forego expressing surprise that my brethren of the majority can find fault with it. In this dissent I shall try to avoid repeating what the lower court has so well said and to confine myself to an effort to refute the holdings of the majority where they do attack and reject the lower court's opinion.

A good place to start is the quotation made by the majority from the recent case of Cafeteria and Restaurant Workers Union v. McElroy, 1961, 81 S.Ct. 1743, wherein the discussion is made of one's right to "go to Bagdad." I would add to the language quoted by the majority from that case the sentences which follow it:

"It is the petitioner's claim that due process in this case required that Rachel Brawner be advised of the specific grounds for her exclusion and be accorded a hearing at which she might refute them. We are satisfied, however, that under the circumstances of this case such a procedure was not constitutionally required.

"The Fifth Amendment does not require a trial-type hearing in every conceivable case of government impairment of private interests. ' * * The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation. * * * "Due process," unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.' It is 'compounded of history, reason, the past course of decisions * * *' Joint Anti-Fascist [Refugee] Comm [ittee] v. McGrath, 341 U.S. 123, 162–163 [71 S.Ct. 624, 643, 95 L.Ed. 817] (concurring opinion).

"As these and other cases make clear, consideration of what procedure due process may require under any given set of circumstances must begin with a determination of the *precise nature of the government*

[1]. 1960, 186 F.Supp. 945.

*function involved as well as of the private interest that has been affected by governmental action.* Where it has been possible to characterize that private interest (perhaps in over-simplification) as a mere privilege subject to the Executive's plenary power, it has traditionally been held that notice and hearing are not constitutionally required. * * * " 2 [Emphasis added.]

The failure of the majority to follow the reasoning of McElroy, supra, results, in my opinion, from a basic failure to understand the nature and mission of schools. The problem presented is *sui generis.*

Everyone who has dealt with schools knows that it is necessary to make many rules governing the conduct of those who attend them, which do not reach the concept of criminality but which are designed to regulate the relationship between school managment and the student based upon practical and ethical considerations which the courts know very little about and with which they are not equipped to deal. To extend the injunctive power of federal courts to the problems of day to day dealings between school authority and student discipline and morale is to add to the now crushing responsibilities of federal functionaries, the necessity of qualifying as a Gargan-

tuan aggregation of wet nurses or baby sitters. I do not believe that a balanced consideration of the problem with which we are dealing contemplates any such extreme attitude. Indeed, I think that the majority has had to adopt the minority view of the courts in order to reach the determination it has here announced.

Nor do I find of favorable (to the majority) significance the introductory sentence quoted by it from the annotation in 58 A.L.R. at page 909.3 The quoted statement implies, rather, that there is no case where a student at a public college or university has taken the position that he was entitled to a hearing before being expelled. More in point, it seems to me, is the addition to the text found on page 4 of the July 1961 pocket part of American Jurisprudence, Vol. 55, § 22, page 16, of the article on Universities and Colleges. I quote the closing sentences of 55 Am.Jur., § 22, pp. 15–16 of that article, adding the paragraph appearing in the pocket part:

" * * * Where the conduct of a student is such that his continued presence in the school will be disastrous to its proper discipline and to the morals of the other pupils, his expulsion is justifiable. Only where it is clear that such an action with respect to a student has not been an honest exercise of discretion, or has

2. The dissenting opinion in that case contains language which further illuminates the problem before us:

" * * * But the Court goes beyond that. It holds that the mere assertion by government that exclusion is for a valid reason forecloses further inquiry. That is, unless the government official is foolish enough to admit what he is doing—and few will be so foolish after today's decision—he may employ 'security requirements' as a blind behind which to dismiss at will for the most discriminatory of causes.

"Such a result in effect nullifies the substantive right—not to be arbitrarily injured by Goverment—which the Court purports to recognize. * * * For under today's holding petitioner is entitled to no process at all. She is not told what she did wrong; she is not given a

chance to defend herself. She may be the victim of the basest calumny, perhaps even the caprice of the government officials in whose power her status rested completely. In such a case, I cannot believe that she is not entitled to some procedures.

" '[T]he right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society.' " [Citing McGrath, supra.]

3. "The cases involving suspension or expulsion of a student from a public college or university all involve the question whether the hearing given to the student was adequate. *In every instance the sufficiency of the hearing was upheld.*" [Emphasis added.]

arisen from some motive extraneous to the purposes committed to that discretion, may the courts be called upon for relief.

"There is a conflict of authority as to whether notice of the charges and hearing are required before suspensions or expulsion of a student. Assuming that a student is entitled to a hearing prior to his expulsion from an institution of learning, the authorities are not in agreement as to what kind of hearing must be given to him. A few cases hold that he is entitled to a formal hearing clothed with all the attributes of a judicial hearing. However, the weight of authority is to the effect that no formal hearing is required."

The general rule covering the subtitle "Government and Discipline" in the general treatise on Colleges and Universities is thus stated in the black-typed summary of the law in Vol. 14 C.J.S. Colleges and Universities, § 26, page 1360:

"Broadly speaking, the right of a student to attend a public or private college or university is subject to the condition that he comply with its scholastic and disciplinary requirements, and the proper college authorities may in the exercise of a broad discretion formulate and enforce reasonable rules and regulations in both respects. The courts will not interfere in the absence of an abuse of such discretion."

All of these expressions of the general rule seem to me to justify and require our adherence to that rule under the facts of this case. The majority opinion sets out many of them, but I think its statement should be supplemented and set forth in chronological order.

Appellants and other members of the student body of Alabama State College had, for a period prior to the happenings outlined, been attending meetings at Negro churches and other places where outsiders, including professional agitators, had been counseling that the students of that institution engage in "demonstrations." Appellants, along with a total of between twenty-nine and thirty-five students of the college, proceeded en masse into a snack bar in the basement of the county court house at Montgomery, Alabama, seating themselves in the privately owned facility so as to occupy nine tables. The lady in charge of the eating place asked them to depart and they refused. Officers were called and, upon their arrival, they first asked that all white patrons leave the premises, which was promptly done. The Negroes refused their request to leave until the lights were put out, whereupon they proceeded to the hall of the court house. Inasmuch as they were blocking ingress and egress therefrom, they were ordered by the officers to take their stands against the walls, which they did. They remained in the court house about one and one-half hours following their entrance about 11:00 A.M. They refused to give their names to reporters who interviewed them. The occurrence took place on February 25, 1960.

The president of the college, H. Councill Trenholm, investigated the occurrence at the direction of the governor of Alabama and made his report and recommendation to the State Board of Education. About five o'clock on the afternoon of the occurrence he had released a mimeographed statement making an appeal to the students and staff that they "refrain from any activities which may have a damaging effect upon the reputation and relationships of college and * * * have concern that there not be any type of further involvement of any identified student of Alabama State College." He reported that, from his investigation conducted on the campus, it was his opinion that twenty-nine students who were the leaders in the activities he had investigated were subject to expulsion.[4]

4. The governor recommended, however, that only Bernard Lee, Norfolk, Va.; St. John Dixon, National City, Cal.; Edward E. Jones, Pittsburg, Pa.; Leon Rice, Chicago, Ill.; Howard Shipman, New York, N. Y. ; Elroy Emory, Ragland,

On February 26, 1960, several hundred students, including appellants, staged another demonstration at the Montgomery Court House by attending a trial where a fellow student was charged with perjury to which he pled guilty. The several hundred demonstrators marched around the court house and then walked, two by two, back to the college about two miles away. A snapshot received in evidence depicted a mob-like gathering, on the college campus on the same day, of a large number of students ganged about the college president of thirty-five years tenure. The expressions on the faces of the participants, including at least some of appellants, portrayed a group in the grip of anger, exhibiting a threatening and menacing attitude. The scene spoke more eloquently to the trial court of the spirit and attitude of the appellants and the followers they had gathered than many reams of oral testimony could have.

February 27, several hundred Negro college students, including appellants, staged mass demonstrations in Montgomery and Tuskegee, some of which were attended by violence. On the same day a large group of students from the college, including appellants, gathered at a Negro church and one of appellants, Bernard Lee, filed a petition with the governor in which it was stated, among other things: "We strongly feel that our conduct was not of such that we should owe our college or state an apology. If our conduct has disturbed you or President Trenholm, we regret this. But we have no sense of shame or regret for our conduct * * *"

On the same day the governor was advised by the college president that he had called upon members of the student body to behave themselves and return to classes and had urged the students not to engage in conduct which might cause racial disturbances. A like plea was made by the Attorney General of Ala-

bama both to white and colored people. March 1, 1960, at about 8:00 A.M., approximately six hundred students of the college marched to the steps of the state capitol, where student leaders, including appellants, made addresses calling on all the students to boycott and strike against the college if any students were expelled. The gathering was policed by a number of the state officials to prevent untoward incidents.

March 2, 1960, the State Board of Education met and heard Dr. Trenholm's report, ordering the nine students mentioned above to be expelled and twenty to be placed on probation. The Board had the benefit of reports made by agents of the Department of Public Safety, which revealed the names of the demonstrators and of their leaders, as well as that of college president and of the governor who had witnessed portions of the demonstrations.

March 3, 1960, the date of the expulsion order, about two thousand Negro students staged a demonstration at a church near the college campus at which appellants were the leaders. They urged the students to refrain from returning to classes and from registration for the new term, and publicly denounced the State Board and the college administration. The students stayed away from classes and milled about the campus in general disorder.

These events all transpired before the expulsion of appellants. But the "demonstrations" did not cease. March 4, a wildly cheering crowd of Negro students gathered at a church and were addressed by one or more agitators of national prominence, and an appeal was made for a meeting the following Sunday on the steps of the state capitol. At the meeting, one or more of appellants and a number of other students were very critical of the governor and the college administration.

Ala.; James McFadden, Prichard, Ala.; Joseph Peterson, Newcastle, Ala.; Marzette Watts, Montgomery, Ala., be expelled at the end of the current term and that

the remainder be placed on probation and allowed to remain in school pending good behavior.

March 5, 1960, appellant Bernard Lee, representing the demonstrators, sent a telegram to the president of the student body at Tuskegee urging them to join in the demonstrations.

March 6, 1960, several thousand Negroes, including appellants and hundreds of the students of the college assembled near the steps of the capitol and approximately ten thousand white people gathered in the same vicinity. A large gathering of city and county officers and the use of fire hose finally avoided an open clash between the two groups. For a number of days following, there were demonstrations on the campus of the college accompanied by some violence and some arrests were made by the police.

March 11, the entire group which had initiated the demonstrations were convicted and fined. Several months later, appellants and several other students were still engaged in constant efforts to stir up trouble and dissension among the students and faculty of the college.

After appellants were expelled a document signed by one of them, on behalf of the executive committee of the student body, issued a public call to the student body of every school in Alabama, in the South and in the nation to support the appellants, and the same document called upon parents, teachers and the people of the nation to give them support.

Each of the appellants had, in his application for admission to the college, agreed in writing to abide by college policies and regulations relating to admission, attendance, conduct, withdrawal or dismissal.

A part of the foregoing recital is taken from the affidavit of Governor Patterson of Alabama. It was attached to and offered as a portion of the answer of appellees to the complaint and the motion for preliminary injunction. This motion was considered along with all of the other motions filed and with the hearing of witnesses and was included in the order from which this appeal was taken. The affidavit was competent evidence even in a court. Rule 43(e) F.R.Civ.P., 28 U.S.C.A.

The opinion of the majority stresses that definite proof was not made of the attendance of all of the appellants at all of the "demonstrations" (the word is taken from the testimony of the only appellant who testified in the court below). I think that ample showing was made to establish that the appellants were at all of the demonstrations and were the ringleaders of them. They participated in the enterprise as joint venturers from the start and every document emanating from them showed the adhesiveness of the group.

It is interesting to find what the majority considers to be the significance of an assumed absence of proof in the light of the fact that only one of the appellants took the witness stand in the court below, although they all announced at the outset that they were ready for trial and manifestly were present in court. Their presence and participation in all which transpired was shown by believable evidence and circumstances and stand wholly undenied. In a recent case charging a fraudulent civil conspiracy against a defendant [5] where the proof was very slim, this Court speaking through Judge Rives, stated the rule as follows:

> "Certainly, the proof was sufficient to make out a prima facie case of appellant's involvement in each of the transactions and liability to respond civilly in liquidated damages under the statute; * * * his failure either to take the stand, or show that he was unable to testify, or even to offer any excuse whatever for his failure to testify in explanation of suspicious facts and circumstances peculiarly within his knowledge, fairly warrants the inference that his testimony, if produced, would have been adverse."

See to the same effect these additional cases from this Circuit: United States v. Leveson, 1959, 262 F.2d 659; United

---

5. Daniel v. United States, 5 Cir., 1956, 234 F.2d 102, 106, certiorari denied 352 U.S. 971, 77 S.Ct. 362, 1 L.Ed.2d 324.

States v. Marlowe, 1956, 235 F.2d 366; Williams v. United States, 1952, 199 F.2d 921; Paudler v. Paudler, 1950, 185 F.2d 901, certiorari denied 341 U.S. 920, 71 S.Ct. 742, 95 L.Ed. 1354; and United States v. Priola, 1959, 272 F.2d 589.

A *fortiori*, in an equity case where parties are seeking the extreme remedy of injunction against state officers, it does not lie in the mouths of appellants to decry the weakness of the opposition proof when they, having all the facts in their possession, sit silently by when challenged by assertions which it behooved them to refute if they would support their case. They were accused and convicted by competent proof, including a picture and writings authored by them, of public boorishness, of defying the authority of the officials of their school and state, of blatant insubordination, of endeavoring to disrupt the school they had agreed to support with loyalty, as well as to break up other schools, and had openly incited to riot; and when their time came to speak, they stood mute, offering only one of their group along with the college president and two newspaper reporters as witnesses.

Before they were notified of their expulsion they had issued public statements admitting everything which was the basis of their expulsion, and had disclosed everything they could have brought forward in any hearing which might have been given them before they were notified that their conduct required their separation from connection with the college. It is difficult to perceive the validity of the argument that they were not given a hearing when, called upon to refute proof offered against them and themselves carrying the burden of proof throughout, they failed to say a word in their defense.

We are trying here the actions of State officials, which actions we are bound to invest with every presumption of fairness and correctness. Certainly the Board had before it a responsible and credible showing which justified their finding that these appellants were guilty of wilful disobedience of the rules and directives of the head of the college they were attending and of conduct prejudicial to the school and unbecoming a student or future teacher in the schools of Alabama, as well as of insubordination and insurrection and inciting other peoples to like conduct. It is undisputed that the Board made a leisurely and careful investigation and passed its judgment in entire good faith. The State of Alabama had no statute and the school had no rule or regulation requiring any other hearing than that which was had, and the Board was entirely justified in declining "to continue to accept responsibility for the supervision and service to any student with whom the relationship becomes unpleasant and difficult." It is worth noting, too, that President Trenholm, testifying as a witness for appellants, stated that the rules of the school had been in effect more than thirty years; and that there was no requirement in them for notice or hearing and that prior practices did not include such as a precedent.

It is undisputed that failure to act as the Board did act would have resulted in a complete disruption of discipline and probable breaking up of a school whose history ran back many years, and whose president had held the position for thirty-five years. If he and the School Board had done less, they would, in my opinion, have been recreant to their duties. The moderate action they took did bring order out of chaos and enable the school to continue operation.

I do not feel that we are called upon here to volunteer our ideas of procedure in separating students from state colleges and universities. I think each college should make its own rules and should apply them to the facts of the case before it, and that the function of a court would be to test their validity if challenged in a proper court proceeding.

A sane approach to a problem whose facts are closely related to the one before us was made by the United States Court of Appeals for the Second Circuit in Steier v. New York State Education Commission et al., 1959, 271 F.2d 13. Its attitude is thus epitomized on page 18:

"Education is a field of life reserved to the individual states. The

only restriction the Federal Government imposes is that in their educational program no state may discriminate against an individual because of race, color or creed.

"As so well stated by Judge Wyzanski in Cranney v. Trustees of Boston University, D.C., 139 F. Supp. 130, to expand the Civil Rights Statute so as to embrace every constitutional claim such as here made would in fact bring within the initial jurisdiction of the United States District Courts that vast array of controversies which have heretofore been raised in state tribunals by challenges founded upon the 14th Amendment to the United States Constitution. It would be arrogating to [the] United States District Courts that which is purely a State Court function. Conceivably every State College student, upon dismissal from such college, could rush to a Federal Judge seeking review of the dismissal.

"It is contrary to the Federal nature of our system—contrary to the concept of the relative places of States and Federal Courts.

"Whether or not we would have acted as did the Administrator of Brooklyn College in dismissing the plaintiff matters not. For a Federal District Court to take jurisdiction of a case such as this would lead to confusion and chaos in the entire field of jurisprudence in the states and in the United States."

Certainly I think that the filing of charges, the disclosure of names of proposed witnesses, and such procedures as the majority discusses are wholly unrealistic and impractical and would result in a major blow to our institutions of learning. Every attempt at discipline would probably lead to a *cause célébre,* in connection with which federal functionaries would be rushed in to investigate whether a federal law had been violated.

I think we would do well to bear in mind the words of Mr. Justice Jackson:[6]

" * * * no local agency which is subject to federal investigation, inspection, and discipline is a free agency. I cannot say that our country could have no central police without becoming totalitarian, but I can say with great conviction that it cannot become totalitarian without a centralized national police."

I think, moreover, that, in these troublous times, those in positions of responsibility in the federal government should bear in mind that the maintenance of the safety, health and morals of the people is committed under our system of government to the states. More than a hundred year ago Chief Justice Marshall[7] stated the principle in these words:

"The power to direct the removal of gunpowder is a branch of the police power, which unquestionably remains, and ought to remain, with the states."

I dissent.

---

6. "The Supreme Court in the American System of Government," p. 70.

7. Brown v. Maryland, 1827, 12 Wheat. 419, 6 L.Ed. 678.