EDITH H. JONES, Circuit Judge,
dissenting:
With due respect to my colleagues’ refusal to set a “constitutional floor” for the students’ procedural due process claims, I dissent. This case is the canary in the coal mine, auguring worse to come if appellate courts do not step in to protect students’ procedural due process right where allegations of quasi-criminal sexual misconduct arise. Yes, there is undisputed graphic evidence—videos and a photo of what transpired among McConnell, Plummer and the Female Student on November 19, 2014. The panel’s conclusion seems driven by the “unique facts” of graphic evidence to- discount all of McConnell’s and Plum-mer’s serious arguments. Put bluntly, the panel implies that because they were guilty, they got enough due process.
*779 The panel’s mode of analysis, in my view, is contrary to Carey v. Piphus, 435 U.S. 247, 265, 98 S.Ct. 1042, 1053, 55 L.Ed.2d 252 (1978). In Carey, high school students were suspended for a few weeks without any adjudicative hearing; the authorities did not challenge the lower courts’ liability determinations. Carey makes clear that the result of a deprivation of liberty or property does not justify the procedural means: “Even if respondents’ suspensions were justified, and even if they did not suffer any other actual injury, the fact remains that they were deprived of their right to procedural due process.” 435 U.S. at 265, 98 S.Ct. at 1053. Further, “[bjecause the right to procedural due process is ‘absolute’ in the sense that it does not depend upon the merits of a claimant’s substantive assertions, and because of the importance to organized society that procedural due process be observed, we believe that the denial of procedural due process should be actionable for nominal damages without proof of actual injury.” 435 U.S. at 266, 98 S.Ct. at 1054 (citations omitted). See also Zinermon v. Burch, 494 U.S. 113, 126 n.11, 110 S.Ct. 975, 983, 108 L.Ed. 2d 100 (1990); Bowlby v. City of Aberdeen, Miss., 681 F.3d 215, 219 (5th Cir. 2012); Caine v. Hardy, 943 F.2d 1406 (5th Cir. 1991) (en banc).
I would hold that several features of the process to which McConnell and Plummer were subjected, most prominently the intermingled and inherently conflicting duties of UH Title IX Coordinator Baker, violated their due process rights to defend against quasi criminal charges of sexual assault and facilitating sexual assault. I would reverse and remand for further proceedings, which necessarily include the question of qualified immunity.
The background of this controversy, left unmentioned by the panel although both parties cited and relied on it, is the promulgation by the United States Department of Education, Office of Civil Rights, of a circular that offered “guidance” on how universities must respond to complaints of sexual misconduct on campus. See United States Department of Education, Office of the Assistant Secretary for Civil Rights, Dear Colleague Letter, (2011), available at http://www2.ed.gov/ print/about/offices/list/ocr/letters/colleague-201104.html. The circular was not adopted according to notice-and-comment rulemak-ing procedures;[1] its extremely broad definition of “sexual harassment” has no counterpart in federal civil rights case law;[2] and the procedures prescribed for adjudication of sexual misconduct are heavily weighted in favor of finding guilt. Institutions of higher learning, like the University of Houston, flocked to embrace the “guidance.” From a federal government database, it is estimated that between 20,000 and 25,000 complaints of sexual misconduct have been filed based on the “guidance” and thousands of students’ discipline cases adjudicated using procedural standards far less demanding than those accorded most *780 defendants. See K.C. Johnson & Stuart Taylor, Jr., The Campus Rape Frenzy 9-10 (Encounter Books 2017). A number of lawsuits challenging these procedures have survived preliminary motions to dismiss, see Johnson & Taylor passim, as state and federal courts exhibited concern about deficient procedures.
The University policies used in this case largely tracked the DOE guidance letter. For this reason, it is a hollow claim that the procedures are owed particular deference as products of “institutions of higher learning.” These policies were developed by bureaucrats in the U.S. Department of Education and thrust upon educators with a transparent threat of withholding federal funding. Viewed as a whole, without the panel majority’s self-imposed blinkers, the procedures raise serious questions about the sufficiency of the University of Houston’s procedures to adjudicate fully and fairly charges of sexual misconduct that will affect the students’ future lives as surely as criminal convictions.
In part because the female had no recollection of these events, and she denied anyone had touched or hit her, she declined to file a charge against the students. Because of insufficient evidence, no criminal charges were filed.
Instead, McConnell and Plummer were investigated and charged by Baker, the Vice President of the UH Office of Equal Opportunity Services (EOS), with various violations of the UH sexual misconduct policy (2013 version). Baker’s official Title IX position placed him in the multiple, and inherently conflicting, roles of advocating for the female student, investigating the events, prosecuting McConnell and Plum-mer, testifying as a witness at their hearings, and training and advising the disciplinary hearing panels. By a “more likely than not” standard, his investigative report found that McConnell “violated the sexual assault and attempted sexual assault provisions ... when he engaged in sexual activity with another [sic] [female UH student] on November 19, 2011, without her consent.” Under the same standard, Baker found that Plummer “facilitated/encouraged the sexual assault of another [UH] student.”
During each student’s separate hearings, Baker informed the panels that their only job was to determine “by a preponderance of the evidence,” which he carefully distinguished from the beyond-a-reasonable doubt standard, whether the results of his investigation should be sustained. And lest it be overlooked, Baker ludicrously tried to persuade the panels that the video portrayed Plummer encouraging McConnell to rape the Female Student.[3] Baker, in essence, assumed the roles of prosecutor, jury and judge, whose decision the hearing panels were required to approve only by a preponderance of the evidence.
Other aspects of the procedures are troubling. Although the students’ attorneys participated in the proceedings to some extent, they were not permitted formally to represent their clients. Instead, McConnell and Plummer each played lawyer against the real lawyer, University EOS Vice President Baker. Thus, the students made opening and closing arguments, tes *781 tified, raised legal and factual objections to the panel, and “cross-examined” witnesses. They were not fully informed of the investigatory evidence until less than a week before each hearing;[4] even then, witness identities were redacted based on “privacy” concerns. Most important, there was no “confrontation” of the female student, who never appeared, was not deposed, and was never investigated for her lascivious advances toward Plummer.[5]
Based on the graphic video and photo evidence, it is unsurprising that the hearing panels upheld Baker’s charges and the students’ appeals were rejected. (The meaning of “sexual assault” in this context is open-ended but could have covered the conduct here.) They were expelled and permanently banned from UH and any activities connected with it. The disciplinary notations were removed from their official transcripts, but that matters little for the impact of the “sexual predator” stigma on their careers and reputations.[6]
The panel correctly cites this court’s decision in Dixon for the proposition that the students have at least liberty interests protected under the due process clause.[7] Dixon v. Alabama State Bd. of Ed., 294 F.2d 150, 151 (5th Cir. 1961).[8] The panel *782 concludes as a matter of law that the process offered to McConnell and Ryan was constitutionally sufficient, relying in large part on the “unique facts” and case law that has little in common with quasi criminal charges of sexual assault that will mar these students indefinitely. Two Sixth Circuit cases, one published and one unpublished, will be shown to be particularly weak reeds. Flaim v. Med. Coll. of Ohio, 418 F.3d 629, 639-43 (6th Cir. 2005); Doe v. Cummins, 662 Fed.Appx. 437, 446-451 (unpublished) (6th Cir. 2016).
In my contrary view, the process deployed against the students was fundamentally flawed because of (a) the absence of a complaint by and evidence from the Female Student; (b) the conflicting roles played by Baker; (c) the preponderance standard for adjudicating quasi criminal conduct (for which no actual criminal charges were brought), compounded by (d) the deference that Baker insisted was due by the hearing panels to his position.[9] While it seems incontestable that punishment of some kind was due for the students’ graphically depicted conduct, these watered-down elements of process conspired to assure that Baker’s recommendations to throw the book at McConnell and Plummer would be approved in foil.
Put in terms of the Matthews balancing test, Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), the students’ interests in preserving their educational status and reputations in the face of serious sexual misconduct charges were compelling.[10] Second, the risk of erroneous deprivation was exacerbated by (i) the Female Student’s failure to participate or provide evidence in the disciplinary proceeding; (ii) Baker’s role as her “advocate” while he also served as prosecutor, a witness, and legal adviser to the hearing panel; (iii) the preponderance test used by Baker in his report, along with the deference he claimed from the hearing panel;[11] and (iv) the imbalance be *783 tween the level of counsel participation allowed on each side.
Third, additional or substitute safeguards would have enhanced the quality of factfinding and adjudication by providing a confrontation right if material fact issues existed. Eliminating Baker’s role in advising and directing the hearing panel would have enabled the panel to make independent findings and receive disinterested advice on issues such as the meaning of “sexual assault” and “facilitating sexual assault.” [12] Elevating the standard of proof to clear and convincing, a rung below the criminal burden, would maximize the accuracy of factfinding. Permitting counsel to represent the students would have resulted in more efficient hearings; the parties and hearing panels spent a lot of time sparring over trivial misunderstandings about procedure. Adopting some or all of the foregoing safeguards would not significantly impede the disciplinary process.
Fourth, the University’s interest lies in impartially adjudicating quasi criminal sexual misconduct allegations. The University has no significant expertise in this area; indeed, as noted above, its policies and procedures derive directly from the Dear Colleague letter, not from inherently educational decisions. Further, to the extent that UH eliminates confrontation and counsel participation; allows one officer, Baker, to direct the investigatory, prosecu-torial and adjudicative process; and relies on the lowest standard of proof, the integrity of its decisions may be questioned and discredited.[13]
Even assuming that McConnell and Plummer forfeited a challenge to their inability to confront the Female Student, the problem of Baker’s conflict of interest cannot be overstated. Baker could not conscientiously “advocate” for the Female Student while also conducting an impartial investigation of the accused students. He could not both prepare a report and testify as a principal witness while serving as the prosecutor and then insist that the adjudicatory hearing panel agree with his “preponderance” evaluations of the evidence by their preponderance standard. But he purported to do all these things. Even the Dear Colleague letter admonishes universities that: “The Title IX coordinator should not have other job responsibilities that may create a conflict of interest. For example, serving as the Title IX coordinator and a disciplinary hearing board member or general counsel may create a conflict of interest.” Dear Colleague Letter at 7. To the extent Baker’s multiple roles substantially lessened the hearing panels’ factfinding and adjudicatory autonomy, the integrity of the process was compromised. See also Brandeis Univ., 177 F.Supp.3d at 606 (“The dangers of combining in a single individual the power to investigate, prosecute, and convict, with little effective power of review, are obvious. No matter how well-intentioned, such a person may have preconceptions and biases, may make mistakes, and may reach premature conclusions.”).
As a final note, the Sixth Circuit case law cited by the panel is inapposite. In Flaim, the court upheld a medical student’s expulsion after he had pled guilty to a felony criminal drug offense. While rejecting Flaim’s individual procedural com *784 plaints, the court stated five times that the fact of a preexisting criminal conviction rendered his case “quite different from the ordinary” student discipline matter, 418 F.3d at 642-43, and “because of the unique facts,” the court declined “to address whether these procedures would suffice under other facts.” Id. at n. 8. Flaim, by its own terms, should not be relied on in a case where sexual assault is alleged only by the University’s EOS Vice President and no criminal charges, much less convictions, were pursued. The Flaim court stated, “We strongly emphasize that a disciplinary hearing involving a record of conviction is wholly different from a case involving disputes of fact, even if the university believes the evidence to be overwhelming.” Id. at n. 7.
The panel’s reliance on the Sixth Circuit’s unpublished opinion in Doe is also curious. First, that the opinion is “unpublished” means it is not to be cited as precedent. 6th Cir. R. 32.1; Crump v. Lafler, 657 F.3d 393, 405 (6th Cir. 2011) (en banc) (“Unpublished decisions in the Sixth Circuit are, of course, not binding precedent.”). Second, the panel cites Doe for the uncontroversial proposition that students there, subjected to a different set of procedures, received an “opportunity to be heard in a meaningful time and in a meaningful manner,” albeit not the level of protection that would have been offered to criminal defendants. 662 Fed.Appx. at 446 (quoting Mathews, 424 U.S. at 333, 96 S.Ct. 893). Third, the Doe court found no due process violation in the denial of active participation by the students’ advisors because the university had not itself been represented by counsel in their disciplinary hearings. 662 Fed.Appx. at 448-49 (citing Flaim, 418 F.3d at 640). In this case, however, the students were out-gunned by attorney Baker. Fourth, the Doe court rejected the claim of official bias because any defects in the investigator’s report were “cured” by the Administrative Review Committee’s “subsequent handling of appellants’ cases.” 662 FedAppx. at 450. Contrary to several critical facts before us, Doe contains no indication that the allegedly biased investigator played any role in the committee’s activity; the committee was bound by no formal standard of review; and no claim of deference to the investigator’s report was made. Finally, the students in the case received, respectively, a 3-year suspension and a disciplinary suspension plus a research paper requirement, far more lenient treatment than that accorded McConnell and Plum-mer, even though the Doe defendants were found to have engaged in nonconsensual sex with female students.
In sum, I do not take the position that the students must be afforded the same procedural protections as criminal defendants. What drives my concern is the close association between the charges le-velled against them and actual criminal charges. Sexual assault is not plagiarism, cheating, or vandalism of university property. Its ramifications are more longlast-ing and stigmatizing in today’s society. The University wants to have it both ways, degrading the integrity of its fact-finding procedures, while congratulating itself for vigorously attacking campus sexual misconduct. Overprosecution is nothing to boast about.
Even though these students deserved punishment, they also deserved more protective procedures given the seriousness of the charges. See Carey, supra. Accordingly, I would reverse and remand for further proceedings.

. The Dear Colleague Letter is currently being challenged in the U.S. District Court for the District of Columbia on the grounds that it did not go through notice-and-comment rule-making, is in excess of the Department of Education’s statutory authority, and constituted arbitrary and capricious agency action. See Complaint at 18-22, Doe v. Lhamon, No. 1:16-cv-00158 (D.D.C. June 16, 2016), ECF. No. 1.

. Cf. Davis v. Monroe Cty. Bd. of Ed., 526 U.S. 629, 634, 119 S.Ct. 1661, 1667, 143 L.Ed.2d 839 (1999) (student-on-student sexual harassment actionable only where it is “so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit”); Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (sexual harassment must be "severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive”).

. The hearing transcripts demonstrate that Baker pressed his accusations beyond the photo and videos, in the guise of “interpreting” the evidence, to assert that Plummer was encouraging McConnell to attempt rape. When challenged about this during one hearing, Baker responded: “I cannot interpret evidence, that [then?] I cannot be a Title IX coordinator because that’s exactly what I’ve been hired to do. I’ve been hired to resolve tírese complaints by interpreting policy and by interpreting evidence...." A university discipline panel is no place to adjudicate credible accusations of rape—and there were no such accusations here.

. The University’s procedures required only five business days’ prior notice of evidence against the students.

. UH’s brief defends its practices, noting that "the Department of Education has stated that it ‘strongly discourages a school from allowing the parties to personally question or cross-examine each other during a hearing on alleged sexual violence.' ” The cited DOE guidance goes on to explain that this is because "[ajllowing an alleged perpetrator to question a complainant directly may be traumatic or intimidating, and may perpetuate a hostile environment.” See United States Department of Education, Office for Civil Rights, Questions and Answers on Title DC and Sexual Violence, http://www2.ed.gov/about/offices/ list/ocr/docs/qa-201404-title-ix.pdf, at p. 31. It then recommends that schools limit cross-examination by pre-submitting questions to a hearing board and that the hearing board screen the questions, which is what happened in this case. Given the nature of charges against these students, limiting cross-examination to written questions seems dubious. See Doe v. Brandeis Univ., 177 F.Supp.3d 561, 604-05 (D. Mass. 2016) ("While protection of victims of sexual assault from unnecessary harassment is a laudable goal, the elimination of such a basic protection for the rights of the accused raises profound concerns.”).

. Accord Univ. of Tex. Med. Sch. at Hous. v. Than, 901 S.W.2d 926, 929-30 (Tex. 1995) (“A medical student charged with academic dishonesty faces not only serious damage to his reputation but also the loss of his chosen profession as a physician. The stigma is likely to follow the student and preclude him from completing his education at other institutions.”).

. Univ. of Tex. Med. Sch. at Hous., 901 S.W.2d at 929-30 (recognizing liberty interest in graduate education under Texas Constitution). Property interests are creatures of state law, and Texas has not recognized a property interest in graduate higher education. Id. at 930 n.l. Other courts have applied Dixon to property interests created by state law. See, e.g., Barnes v. Zaccari, 669 F.3d 1295, 1303-04 (11th Cir. 2012).

. Other federal courts have relied on Dixon for the proposition that protected interests are implicated by university suspensions and expulsions. See, e.g., Barnes, 669 F.3d at 1305; Flaim v. Med. Coll. of Ohio, 418 F.3d 629, 633-36 (6th Cir. 2005); Pugel v. Bd. of Trs. of Univ. of Ill., 378 F.3d 659, 663-64 (7th Cir. 2004); Gorman v. Univ. of R.I., 837 F.2d 7, 13-14 (1st Cir. 1988); Nash v. Auburn Univ., 812 F.2d 655, 662-63 (11th Cir. 1987); Harris v. Blake, 798 F.2d 419, 422-23 (10th Cir. 1986); Henson v. Honor Comm. of U. Va., 719 F.2d 69, 73-74 (4th Cir. 1983); Sill v. Pa. State Univ., 462 F.2d 463, 469-70 (3d Cir. 1972); Winnick v. Manning, 460 F.2d 545, 548-49 (2d Cir. 1972); Esteban v. Cent. Mo. State Coll., 415 F.2d 1077, 1089 (8th Cir. 1969); Doe v. Rector & Visitors of George Mason Univ., 149 F.Supp.3d 602, 615 (E.D.Va. 2016).
This court seems to have overlooked Dixon when deciding recent cases that, unlike this one, involved discipline for academic reasons. *782 See, e.g., Perez v. Texas A&M Univ. at Corpus Christi, 589 Fed.Appx. 244, 248 (5th Cir. 2014) (per curiam); Smith v. Davis, 507 Fed.Appx. 359, 362 (5th Cir. 2013) (per curiam).

. I do not agree that the students lacked fair notice that their conduct was unauthorized.

. See Doe v. Rector & Visitors of George Mason Univ., 149 F.Supp.3d at 622 (“[PJlaintiff's lost opportunity to continue with his post-secondary education, coupled with the possibility that he may be unable to pursue meaningful educational opportunities elsewhere while his name remains associated with sexual misconduct, inevitably affects plaintiff's professional prospects. ... And common sense suffices to understand that an adjudication of responsibility for sexual misconduct carries a ... powerful stigma,” such that robust due process is required.); Brandeis Univ., 177 F.Supp.3d at 602 ("Certainly stigmatization as a sex offender can be a harsh consequence for an individual who has not been convicted of any crime, and who was not afforded the procedural protections of criminal proceedings.”); id. at 573 (“If a college student is to be marked for life as a sexual predator, it is reasonable to require that he be provided a fair opportunity to defend himself and an impartial arbiter to make that decision.”); see also Smyth v. Lubbers, 398 F.Supp. 777, 797 (W.D. Mich. 1975) ("This case is among the most serious ever likely to arise in a college context. In the interest of order and discipline, the College is claiming the power to shatter career goals, and to make advancement in our highly competitive society much more difficult for an individual than it already is.”).

.Commentators have noted that applying the civil preponderance standard to quasi criminal charges seriously weakens due process for accused students. See, e.g., Ryan D. Ellis, Mandating Injustice: The Preponderance of the Evidence Mandate Creates a New Threat to Due Process on Campus, 32 Rev. Litig. 65 (2013); Barclay Sutton Hendrix, A Feather on One Side, A Brick on the Other: Tilting the Scale Against Males Accused of Sexual Assault in Campus Disciplinary Proceedings, 47 Ga. L. Rev. 591, 610-15 (2013); Stephen Henrick, A Hostile Environment for Student Defendants: Title IX and Sexual Assault on College Campuses, 40 N. Ky. L. Rev. 49, 62, 62 n.59 (2013).

. The panel majority note that Baker's assistant attorney served as adviser to the disciplinary panel. They have no rejoinder, however, to the “graphic facts” I quoted that demonstrate Baker's intent to dominate the proceedings in every way.

. The majority criticize this description of the University’s interests as too narrow. Had the University adopted a real, serious concern for its “educational mission,” it would not have opened a bar on campus near the dorms that served shots to students. Alcohol abuse is at the root of much student misconduct.