Argued and submitted February 14, affirmed July 5, 2001

In the Matter of
Terrance Terrill Stephens,
a Minor Child.

STATE ex rel JUVENILE DEPARTMENT
OF MULTNOMAH COUNTY,
*Respondent,*

*v.*

TERRANCE TERRILL STEPHENS,
*Appellant.*

8704-812261; A108730

27 P3d 170

Gail M. Berkowitz argued the cause and filed the brief for appellant.

Kaye E. McDonald, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Landau, Presiding Judge, and Linder and Brewer, Judges.

LINDER, J.

**LINDER, J.**

In this delinquency adjudication, youth appeals a trial court judgment finding him within the jurisdiction of the court for acts that, if committed by an adult, would constitute delivery of a controlled substance. ORS 419C.005; ORS 475.992. Youth challenges the trial court's denial of his motion to suppress evidence, arguing that the search of his school locker and its contents was unconstitutional. We review *de novo*, ORS 419A.200(5); ORS 19.415(3), and conclude that youth voluntarily consented to the search. Accordingly, we affirm.

The essential facts are not disputed; the parties disagree only as to the legal significance of the facts. In the spring of 1999, youth, who was then 17 years old, was expelled from Roosevelt High School for fighting with another student. Subsequently, he agreed to enroll in Turnaround School, an alternative public school. Turnaround offers a purely voluntary program in collaboration with Portland Public Schools and the Multnomah County Juvenile Department. It provides middle school and high school students who have been expelled for violence, weapons, or drug and alcohol offenses one "last chance" to stay in the school system. If students who enroll at Turnaround complete the program successfully, the expulsion is removed from their transcripts. Because of the at-risk nature of Turnaround's student body, the school has a very structured environment with strict rules to ensure safety. Of significance here, when the students arrive at the school, they must put all of their belongings into assigned lockers. Only a limited number of school officials have keys to the lockers, and they supervise the students' access to the lockers at all times. As part of the school's daily routine, the students also must submit to pat-down searches, conducted by either a male or female staff member, and they must pass through a metal detector. While the students are in class, school officials conduct random searches of their lockers and the contents for drugs, alcohol, and weapons. The students are escorted everywhere, including to the classrooms and the restrooms.

Upon his referral to Turnaround, youth and his mother met with a school counselor, Cathy Mansfield, who

explained the school's policies to them. In particular, Mansfield described the extent of the searches, stating that anything students bring to school, such as coats, pockets, purses, backpacks, lunches, and pens, will be opened and searched. Mansfield also explained that, in order to enroll at Turnaround, the school requires students and parents to sign a "Family/School Agreement." The school's conditions for attendance, as provided in the agreement, include the following:

"1. I understand Turnaround is voluntary[.]

"2. If accepted, I am willing to follow all Turnaround rules:

"* * * * *

"* Absolutely no contraband in my possession on Turnaround campus, including but not limited to:

"a) weapons, real or look-alike,

"b) drugs or paraphernalia,

"c) cigarettes or tobacco products,

"d) gang colors/language/paraphernalia/sagging.

"* * * * *

"* *Submit to random searches of possessions, lockers, person,* and random UA's[.]"

(Emphasis added.) Both youth and his mother signed the agreement.

After youth had been attending Turnaround for approximately 16 to 20 days, an employee of Turnaround searched his locker pursuant to the daily routine and found a green, transparent plastic pager. Upon picking up the pager, the employee noticed unusual objects in the pager's battery compartment area, which was visible through the transparent plastic. He described the objects as "weird," stating that they looked like "some teeth or something like that." He testified that, based on his experience that students sometimes hide contraband in electronics, he thought the objects were "suspicious." He therefore opened the battery compartment and found what was later confirmed to be three individually wrapped rocks of cocaine. School officials notified the police,

and Officer Gillock arrived at the school to investigate. Gillock read youth his *Miranda* rights and questioned him about the pager and the cocaine; youth admitted that he planned to sell each rock for $20.

The state subsequently filed a petition alleging that youth had engaged in conduct that, if committed by an adult, would constitute delivery of a controlled substance. *See* ORS 475.992. Relying on Article I, section 9, of the Oregon Constitution,[1] and the Fourth Amendment to the United States Constitution,[2] youth moved to suppress evidence obtained as a result of the search of his locker, arguing that the search was conducted without a warrant, consent, reasonable suspicion, or probable cause. Youth also argued that his statements to police should be suppressed because they were fruits of the unlawful search and because they were made involuntarily. At the hearing on youth's motion to suppress, the state argued that youth validly consented to the search. Alternatively, the state argued that youth did not have a privacy interest in the locker that is cognizable under either the state or the federal constitution. The trial court denied youth's motion, concluding that youth consented to the search of his locker and his possessions, which included the pager. After a stipulated facts trial, the trial court found youth to be within its jurisdiction and placed him on probation for one year.

In challenging the trial court's ruling on appeal, youth concentrates his arguments on the constitutionality of the search of his locker and its contents and mentions only incidentally the possible derivative unlawfulness of his statements to police. As the parties frame their arguments, this case presents a series of potentially novel and interesting questions, such as whether, given the unique educational

---

[1] Article I, section 9, provides that "[n]o law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person *or thing to be seized.*"

[2] The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

and safety concerns of this particular school, the search of youth's locker was reasonable under the state and federal constitutions; whether youth had a privacy interest in the locker, given the particular procedures involved at this school for access to student lockers and their contents; and whether reasonable suspicion or probable cause is required under the Oregon Constitution to justify the search of a student's school locker.[3] As did the trial court, however, we conclude that youth validly consented to the search of the locker and all of its contents. We therefore need not reach the other potential bases for the lawfulness of the search.

 Consent is a recognized exception to the warrant requirement of both the state and federal constitutions. *State v. Weaver*, 319 Or 212, 219, 874 P2d 1322 (1994) (discussing consent exception to the warrant requirement under Article I, section 9); *Schneckloth v. Bustamonte*, 412 US 218, 222, 93 S Ct 2041, 36 L Ed 2d 854 (1973) (same under the Fourth Amendment). When the state relies on consent to support a search, it must prove by a preponderance of the evidence that the consent was voluntary and that the state complied with any limitations on the scope of the consent. *State v. Paulson*, 313 Or 346, 351-52, 833 P2d 1278 (1992). In analyzing whether consent to a search is voluntary, the relevant inquiry is whether, under the totality of the circumstances, the consent was the product of the defendant's free will or, conversely, was the result of express or implied coercion. *State v. Parker*, 317 Or 225, 230, 855 P2d 636 (1993); *United States v. Mendenhall*, 446 US 544, 100 S Ct 1870, 64 L Ed 2d 497 (1980) (applying totality of the circumstances test). Voluntary consent may be manifested by conduct as well as by words. *State v. Brownlie*, 149 Or App 58, 62, 941 P2d 1069 (1997). Regarding the standard for measuring the scope of a purported consent, the test is one of "objective reasonableness"—that is, what a typical reasonable person would have understood the scope to be. *State v. Arroyo-Sotelo*, 131 Or App

---

[3] The state and federal cases cited and discussed by the parties on those points include, *inter alia*, *Vernonia School Dist. 47J v. Acton*, 515 US 646, 115 S Ct 2386, 132 L Ed 2d 564 (1995); *New Jersey v. T.L.O.*, 469 US 325, 105 S Ct 733, 83 L Ed 2d 720 (1985); *State ex rel Juv. Dept. v. Rohlffs*, 147 Or App 565, 938 P2d 768 (1997); and *State ex rel Juv. Dept. v. Finch*, 144 Or App 42, 925 P2d 913 (1996).

290, 295-97, 884 P2d 901 (1994); *Florida v. Jimeno*, 500 US 248, 251, 111 S Ct 1801, 114 L Ed 2d 297 (1991).

Because the consent analysis under both the state and federal provisions is the same in this context, our discussion applies equally to youth's state and federal law-based challenges. Youth does not dispute that, before the drugs were found in his locker, he and his mother signed a form upon his voluntary enrollment at Turnaround agreeing to the school's strict policies. Nor does youth dispute that he attended school pursuant to those rules for approximately 16 to 20 days. Rather, youth contends that those actions do not constitute voluntary consent in the constitutional sense because he had no choice but to agree to the school's conditions if he were to attend Turnaround. Youth further argues that, even assuming that he validly consented to the search of his locker by school officials, the scope of that consent did not include the compartments of the pager and he did not specifically agree that anything found in a search could be used as evidence against him in a juvenile adjudication.

■ On this record, however, youth's arguments are unavailing. Youth had been expelled from school and was not obligated to attend Turnaround. *See* ORS 339.030 (providing exemptions from compulsory school attendance); ORS 339.250 (describing expulsion for violating school policies). Youth identifies no basis on which school officials could not legally condition his attendance at Turnaround on his consent to search his locker and possessions. Youth's argument is only that his consent was not the product of his free will and was, instead, a result of express or implied coercion. But the fact that consent derives from a difficult or unpleasant choice is not enough to render it involuntary. Youth's situation in this case is analogous to that of other circumstances where, in exchange for a desired benefit, a citizen must agree to a search of his or her person or belongings. *See, e.g., Brownlie*, 149 Or App at 63 (inferring consent to x-ray screening of a defendant's purse from her conduct in placing it on a conveyor belt at courthouse); *State v. Kelsey*, 67 Or App 554, 679 P2d 335 (1984) (holding that, by attempting to board an airplane, the defendant impliedly consented to a preboarding search at terminal gate). The circumstances here also are akin to those of a defendant who consents to a search when

advised by police that they have probable cause to obtain a search warrant and will do so if consent is declined. There, as here, a defendant is confronted with the reality of what the law permits government officials to do if consent is refused. The decision whether to consent, when made in the face of such a legal reality, is not enough, in and of itself, to render the consent involuntary for constitutional purposes. *See, e.g., State v. Rodal,* 161 Or App 232, 242, 985 P2d 863 (1999).

Beyond the unpleasant reality that he could not attend Turnaround on other terms, there is nothing in the totality of the circumstances in this case to suggest that youth's free will was overborne. School officials fully informed both youth and his mother about the school's conditions and his choices. Mansfield emphasized that attending Turnaround is purely voluntary. She testified that, even though choosing not to attend Turnaround potentially limits students' other educational opportunities because an expulsion remains on their transcript and prevents them from attending another public school until the end of the expulsion period, many students make that decision upon learning about the school's strict rules. Under the totality of the circumstances in this case, there is no evidence that school officials improperly coerced youth to agree to the conditions for enrollment imposed by this particular school. As did the trial court, we conclude that youth's consent was voluntary.

■ We also agree with the trial court that the search did not exceed the scope of youth's consent. The relevant provision of the Family/School Agreement states that students will submit to random searches of their "possessions, lockers, [and] person." In addition, Mansfield orally informed youth that anything he brought to school and put inside his locker would be searched. She specifically advised him not to bring certain items to school and described what would be searched by using illustrative examples. She further explained that, during the course of random searches, items would be opened. With that knowledge, youth agreed explicitly to the school's policies by signing the written agreement; he further agreed implicitly by attending school each day, bringing possessions with him, and placing them in the lockers, where he knew they would be subject to search. He placed no limits on the consent that he gave, nor did he revoke that consent at

any time. *See State v. Charlesworth / Parks*, 151 Or App 100, 951 P2d 153 (1997), *rev den* 327 Or 82 (1998) (holding that when a defendant's consent is unrestricted, an officer can search containers found inside a vehicle). Consequently, school officials were entitled to examine the contents of youth's pager as within the scope of his consent.[4]

Youth's final point is that he did not consent to the evidentiary use of any items found during the search of his locker. Not surprisingly, he cites no authority for the proposition that consent, to authorize a search, must extend to the evidentiary use of the items subsequently seized. We decline his invitation to announce such a rule of law. We adhere, instead, to the settled principle that voluntary consent to the search itself is all that is required.

In sum, under the totality of the circumstances, youth voluntarily consented to the search of his locker and its contents, including the pager, by agreeing to the school's conditions before enrolling and by then attending Turnaround on those terms. The trial court correctly denied youth's motion to suppress.

Affirmed.

---

[4] We note that the pager in this case was admitted into evidence and is part of the record on appeal. Its particular characteristics are significant: it is made of a transparent plastic that enables one to see its inner components. When the school official picked up the pager, and without opening the pager first, that official could see the suspicious contents in the battery compartment area. Given our disposition of the issue, we need not decide whether this object readily announced its contents such that opening it, even without youth's consent, was not a further intrusion. *See State v. Owens*, 302 Or 196, 206, 729 P2d 524 (1986) (applying the "plain view" doctrine to transparent containers and holding that no cognizable privacy interest inheres in their contents).