Argued and submitted July 1, affirmed December 24, 2014, petition for review denied June 4, 2015 (357 Or 324)

DAVID LYNN SIMONSEN,
*Petitioner-Appellant,*

*v.*

Jeff PREMO,
Superintendent, Oregon State Penitentiary,
*Defendant-Respondent.*

Marion County Circuit Court
00C13444; A149229

341 P3d 649

Bronson D. James argued the cause for appellant. With him on the opening brief was JDL Attorneys, LLP. With him on the reply brief was Bronson James, LLC.

Susan G. Howe, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Garrett, Presiding Judge, and Haselton, Chief Judge, and DeVore, Judge.

HASELTON, C. J.

## HASELTON, C. J.

Petitioner, who pleaded guilty to two counts of aggravated murder and was sentenced to death, appeals the dismissal of his petition for post-conviction relief. Petitioner argues, *inter alia*, that the post-conviction court erred in denying his allegation that criminal trial counsel were constitutionally inadequate in advising him to plead guilty to aggravated murder without securing, in return, a guarantee that the state would not seek the death penalty. We reject without extended discussion all of petitioner's challenges to the denial of post-conviction relief except those which pertain to that issue.[1] For the reasons that follow, we conclude that the post-conviction court did not err in concluding that petitioner failed to establish that counsel were

---

[1] Consideration of the substance of petitioner's first assignment of error (pertaining to alleged *ex post facto* and other violations flowing from the imposition of a sentence of death based on a statutory scheme enacted after commission of the crime) is procedurally barred under *Palmer v. State of Oregon*, 318 Or 352, 362, 867 P2d 1368 (1994), both because petitioner failed to plead facts necessary to establish a basis for obtaining post-conviction relief and because that claim was previously raised, and rejected, on direct review. *See State v. Simonsen*, 329 Or 288, 301-02, 986 P2d 566 (1999), *cert den*, 528 US 1090 (2000) (*Simonsen III*); ORS 138.550(2). In all events, even if it were reviewable, that claim would fail on its merits. *See State v. Rogers*, 352 Or 510, 512 n 2, 288 P3d 544 (2012); *State v. Wagner*, 309 Or 5, 786 P2d 93 (1990).

We reject on the merits, without further discussion, petitioner's battery of other allegations pertaining to the performance of trial counsel in both the original criminal proceedings and penalty phase (*State v. Simonsen*, 310 Or 412, 798 P2d 241 (1990) (*Simonsen I*)) and the third penalty phase retrial (*Simonsen III*), including: assignments of error 2.A (claim that trial counsel failed to investigate the crime scene); 2.B (claim that trial counsel failed to properly assess and litigate petitioner's cognitive ability, including the effects of long-term methamphetamine abuse, with respect to petitioner's competency to stand trial, and with respect to petitioner's ability to assess and understand the plea offer); 3.A (claim that trial counsel failed to pursue and allow sufficient time for forensic investigation); 3.B (claim that trial counsel failed to investigate and litigate influence of codefendant over petitioner); 3.C (claim that trial counsel failed to appropriately litigate petitioner's competency); and 2.D and 3.D (claims that cumulative effect of errors by trial counsel in *Simonsen I* and *III* rendered those proceedings fundamentally unfair).

As for petitioner's five other state and federal constitutional claims (alleging violation of right to be free from cruel and unusual punishment, due process violations, and purported unconstitutionality of Oregon's death penalty scheme, including alleged violation of separate vote requirement), those claims fail on multiple grounds: Not only are they insufficiently developed as well as procedurally barred—under ORS 138.550(2) and *Palmer*, 318 Or at 362—but, even if somehow cognizable, they lack substantive merit.

constitutionally inadequate with respect to the guilty plea. Accordingly, we affirm.

We begin with an overview of the facts and the protracted procedural history of the underlying criminal proceedings, as recounted by the Oregon Supreme Court's final opinion on direct review:

"On September 3, 1988, the bodies of two women were found in a remote area near Coquille. Both women, who had been dead for two or three days, were nude from the waist down. They had been tied together at the wrists and shot in the head from close range with a shotgun. Police found a great deal of physical evidence at the scene, including tire tracks from a small automobile.

"Investigators eventually determined that the victims [who were identified as Kathrin Reith and Unna Tuxen] were from West Germany. A week after the bodies were discovered, two witnesses separately came forward to report that defendant [David Lynn Simonsen] had said that he and a man named Jeff Williams had been involved in shooting two women with a sawed-off shotgun. On September 11, 1988, police arrested defendant. After being advised of his rights, defendant gave two statements confessing that he and Williams had abducted, raped, and murdered the women. As a result of defendant's confessions, investigators eventually recovered significant evidence implicating defendant, including the suspect automobile and the murder weapon.

"After being charged with two counts of aggravated murder, defendant pleaded guilty. The trial court conducted a penalty-phase proceeding. The jury answered the penalty-phase questions put to it in the affirmative, and the trial court sentenced defendant to death.

"On October 4, 1990, on automatic review, this court affirmed defendant's convictions, but vacated the sentence of death, because the jury was not presented with the 'fourth question' under ORS 163.150 (1989). *State v. Simonsen*, 310 Or 412, 798 P2d 241 (1990) (*Simonsen I*).

"On remand, defendant again was sentenced to death. However, on automatic review of that sentence, this court held that the state had obtained evidence against defendant in violation of his right against self-incrimination under Article I, section 12, of the Oregon Constitution. *State v. Simonsen*, 319 Or 510, 514, 878 P2d 409 (1994)

(*Simonsen II*). Accordingly, this court again vacated the sentence and remanded the case for a third penalty-phase proceeding."

*State v. Simonsen*, 329 Or 288, 290-91, 986 P2d 566 (1999), *cert den*, 528 US 1090 (2000) (*Simonsen III*) (some internal citations omitted). On remand, a jury sentenced petitioner to death for a third time. That sentence was affirmed by the Oregon Supreme Court. *Id.* at 290.[2]

Having exhausted his direct appeals, petitioner initiated this action in 2000. The post-conviction court denied relief, carefully analyzing and rejecting each of petitioner's claims in a comprehensive (indeed exhaustive) letter opinion, followed by a formal judgment and 37 pages of factual findings and legal conclusions distilled from the original letter opinion. Petitioner appeals, alleging, in part, that he received inadequate assistance of counsel with respect to his guilty plea.

We now turn to those allegations pertaining to the guilty plea. Petitioner alleged that he received inadequate and ineffective assistance during the original criminal proceedings, because trial counsel Earl R. Woods and William D. Dials improperly

"counseled, advised, and persuaded Petitioner to plead guilty to two counts of Aggravated Murder thereby foregoing and waiving his right to a jury determination as to his guilt of the criminal offenses of Aggravated Murder."

Petitioner's opening and supplemental trial memoranda amplified that allegation, alleging that it was *per se* ineffective assistance of counsel "to permit [petitioner] to plead guilty to two counts of Aggravated Murder without the District Attorney taking the penalty of death off the table." Petitioner also argued that that advice was constitutionally deficient given the timing of the plea agreement and trial counsel's alleged failure to conduct a forensic investigation, to further explore petitioner's competency, and to

---

[2] Aggravated murder trials are typically divided into separate guilt and penalty phases. When a defendant pleads guilty, as petitioner did here, a jury is impaneled and sworn for a penalty-phase proceeding only. *State v. McAnulty*, 356 Or 432, 447 n 7, 338 P3d 653 (2014).

litigate the admissibility of the inculpatory statements. In addition, petitioner alleged that counsel failed to explain the consequences of pleading guilty to him and either omitted or misrepresented the content of the plea agreement:

> "Petitioner * * * was under the impression that upon a plea to the two counts of murder, the attendant circumstances of the crime, including the gruesome details and the claimed rapes of the two victims, would not be presented to the jury when it considered his sentence. Woods and Dials' failure to advise the Petitioner of the implications and ramifications of his pleas of guilty to the two charges of Aggravated Murder renders their legal representation Constitutionally inadequate."

As pertinent to our review, the post-conviction court rendered the following findings concerning those allegations:[3]

> "1.   Petitioner's testimony in this proceeding, offered through his deposition, was not credible. Except as specifically noted, this court does not accept his testimony to be true.

> "2.   The testimony of petitioner's trial counsel was credible. This court accepts as true the [deposition] testimony of Earl Woods * * *. This court also accepts as true the testimony of William Dials * * * insofar as it corroborates the testimony of Earl Woods. This court does not find persuasive any legal conclusions or intimations by Dials that either he or Woods provided petitioner with constitutionally ineffective assistance of counsel.

> "* * * * *

> "22.   Both Woods and Dials met with petitioner 'quite often' and 'on a regular basis' and reviewed all of the police reports concerning the homicides with petitioner. Woods felt that he got to know petitioner 'fairly well.' Although Woods felt petitioner was a 'fairly quiet guy,' he also felt petitioner was 'actually fairly bright, fairly articulate.'

> "23.   Petitioner informed Woods that the statements he made to the police after his arrest were accurate and voluntarily given. Petitioner denied being under the influence of any controlled substances when he spoke to the police. Woods

---

[3] The findings recited below contain extensive citations to the record, which are omitted.

found petitioner to be candid and forthright regarding his involvement. Petitioner also never wavered from his position that he shot and killed the victims at Williams' request. Woods once suggested to petitioner that Williams may have been the shooter after all, but petitioner denied it, reaffirming that he had been the one to shoot the victims.

"24.   Petitioner failed to provide *Simonsen I* trial counsel with any reason to doubt the accuracy of his own statements or the investigation conducted by the state. Trial counsel reviewed the entire discovery with petitioner, who confirmed it was accurate. Petitioner provided consistently accurate information to the police about the murders that matched the evidence left at the crime scene. Petitioner confessed in three separate police interviews that he shot the victims at Williams' request. Petitioner also continued to represent himself as the shooter to friends and family.

"\* \* \* \* \*

"30.   Woods and Dials were aware that the prosecution would not agree to any other potential resolution other than asking the jury to determine whether to impose the death sentence. During *Simonsen I*, the only two sentencing options for aggravated murder were the death sentence or a life sentence with the opportunity for parole after 30 years. The prosecution was not open to resolving petitioner's case with a sentence that provided him with an opportunity for parole. At the same time, petitioner was not interested in agreeing to a sentence that did not provide an opportunity for parole.

"31.   Woods and Dials spoke to petitioner [about] how best to present his case to the jury for the best possible outcome. They reached the conclusion that their efforts would best be spent focusing on petitioner's penalty phase, as they had no reason to believe they had a legal or factual basis to contest petitioner's guilt. Woods felt petitioner would have a *better* chance of avoiding the death penalty if petitioner pleaded guilty and accepted legal responsibility for the murders. Petitioner was agreeable to pleading guilty and having Woods and Dials focus their efforts on the penalty phase.

"32.   *Simonsen I* trial counsel negotiated a number of plea conditions that, in their opinion, increased the possibility that the jury would not impose the death sentence. \* \* \*

"\* \* \* \* \*

"33. Consistent with the agreed-upon trial strategy and negotiated plea deal, petitioner pleaded guilty to two counts of aggravated murder. Prior to pleading guilty, petitioner executed a lengthy plea petition that addressed the waiver of legal rights and possible resulting consequences accompanying a guilty plea. Prior to pleading guilty, the trial court also engaged petitioner in a lengthy plea colloquy with petitioner to confirm that he understood his waiver of rights and potential consequences contained in the plea petition. Petitioner agreed that he understood the contents of his plea petition. Petitioner also confirmed that he was satisfied with *Simonsen I* trial counsel's advice and representation."

(Internal citations and footnotes omitted; emphasis in original.)

Based on those and other findings, the post-conviction court determined that trial counsel had developed a reasonable trial strategy, noting that petitioner's allegation "can be read two ways: either trial counsel were constitutionally ineffective *as a matter of law* when they advised petitioner to plead guilty to crimes that still left him eligible for a death sentence, or that trial counsel were unreasonable under the particular facts of petitioner's case in advising petitioner to plead guilty." (Emphasis in original.) Under either approach, the court explained, "petitioner has failed to prove this allegation to be true." More specifically, the post-conviction court reached the following conclusions:

"78. With respect to resolution of petitioner's guilt, *Simonsen I* trial counsel cannot be regarded as constitutionally ineffective *as a matter of law* because they advised petitioner to plead guilty to crimes that still left him eligible for the death sentence. Numerous jurisdictions, including the Supreme Court of the United States, have recognized that trial counsel can reasonably conclude that the best chance of avoiding the death penalty for a capital client is to acknowledge guilt and focus on reasons why the jury should not impose the death penalty during the mitigation/penalty phase.

"79. *Simonsen I* counsel reasonably concluded that litigating petitioner's guilt would only serve to emphasize the brutality of the murders to the jury, which trial counsel wanted to *avoid* doing. By negotiating petitioner's guilty

pleas, trial counsel negotiated a number of conditions that, in their opinion, increased the possibility that the jury would not impose the death sentence.

"80. In light of petitioner's agreement to plead guilty, *Simonsen I* counsel also reasonably concluded to withdraw the motion to suppress [a recorded confession] in exchange for the state's agreement to withdraw their motion for a jury view of the crime scene.

"81. Additionally, as a result of petitioner's guilty pleas, trial counsel were able to argue to the jury that they should not impose the death sentence because petitioner had taken responsibility for the murders. Given trial counsel's reasonable determination that they had no basis to suppress petitioner's detailed confessions and that chances for acquittal with respect to aggravated murder were slim, they reasonably advised petitioner to plead guilty to two counts of aggravated murder in the hopes to help petitioner escape a death sentence."

(Internal citations omitted; emphasis in original.)

On appeal, petitioner challenges the post-conviction court's rejection of his claim that he received inadequate assistance in connection with the advice to plead guilty without a death penalty waiver. That challenge implicates three separate, but related, theories of purported inadequacy. *First,* advice to plead guilty to a capital crime without the prosecution agreeing to waive the death penalty constitutes inadequate assistance of counsel as a matter of law (the "categorical" theory). *Second,* under the circumstances here, trial counsel's plea strategy rendered their performance constitutionally inadequate (the "as-applied" theory). *Third,* in all events, trial counsel failed to adequately inform petitioner of the details of the plea deal and the consequences of pleading guilty.

In reviewing the post-conviction court's resolution of those matters, we are bound by its factual findings that are supported by evidence in the record. *Stroup v. Hill,* 196 Or App 565, 568, 103 P3d 1157 (2004), *rev den,* 338 Or 432 (2005). To obtain post-conviction relief on a state constitutional claim of inadequate assistance of counsel, petitioner must prove, by a preponderance of the evidence, facts demonstrating that trial counsel failed to exercise the

professional skill and judgment necessary to "diligently and conscientiously advance the defense" and that he was prejudiced as a result of that failure. *Krummacher v. Gierloff*, 290 Or 867, 874, 883, 627 P2d 458 (1981). To be entitled to relief under the federal constitution, petitioner must show that trial counsel's performance "fell below an objective standard of reasonableness * * * under prevailing professional norms" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 US 668, 688, 694, 104 S Ct 2052, 80 L Ed 2d 674 (1984).[4]

We begin with the first, categorical proposition: Does advising a defendant to plead guilty to aggravated murder without securing a guarantee that the state will not seek the death penalty necessarily violate the constitutional standard of competent representation? Petitioner contends "that it was *per se* ineffective assistance of counsel to permit [him] to plead guilty to two counts of aggravated murder while the possibility of a death sentence remained," an approach considered "ill-advised" by "experienced capital practitioners." The state remonstrates that petitioner's categorical challenge is unavailing as a matter of law—and invokes authority from other jurisdictions that have recognized that, depending on the particular circumstances of a case, trial counsel can provide adequate representation despite advising a client to plead guilty without a plea bargain waiving·the death penalty.

As explained below, we conclude that advising a capital client to plead guilty notwithstanding the possibility that the penalty phase may result in a death sentence does not render legal representation categorically inadequate. Although no Oregon appellate court has confronted this issue, other jurisdictions are in agreement, and no legal authority that we are aware of suggests otherwise.

---

[4] The state constitutional standard for determining the adequacy of counsel is "functionally equivalent" to the federal standard. *Montez v. Czerniak*, 355 Or 1, 6-7, 322 P3d 487 (2014). *See State v. Davis*, 345 Or 551, 579, 201 P3d 185 (2008) (equating "effective" assistance with "adequate" assistance); *State v. Smith*, 339 Or 515, 526, 123 P3d 261 (2005) (noting similarity between state and federal standards).

Under federal law, *Strickland* establishes the contours of a defendant's right, under the Sixth Amendment to the United States Constitution, to effective counsel in the trial setting, including the plea-bargaining process. *See Lafler v. Cooper*, ___ US ___, 132 S Ct 1376, 1384, 182 L Ed 2d 398 (2012). In general, under *Strickland*—and subject only to narrow exceptions for cases partaking of structural error,[5] or something akin to structural error[6]—the propriety of post-conviction relief is to be assessed on a case-by-case basis. As nearly as we can determine, no jurisdiction has held that advising a client to plead guilty notwithstanding the possibility of a death sentence is categorically unreasonable under *Strickland*. Rather, the consensus of authority is that the reasonableness of such advice and representation is to be assessed on a case-by-case basis.[7]

---

[5] *See United States v. Gonzalez-Lopez*, 548 US 140, 148-50, 126 S Ct 2557, 165 L Ed 2d 409 (2006) (the erroneous denial of certain rights—to self-representation, to public trial, to trial by jury by the giving of a defective reasonable-doubt instruction, and to choice of counsel—qualifies as structural error; such error has pervasive consequences and is not subject to the harmlessness analysis, but, instead, automatically requires reversal).

Oregon has not adopted the doctrines of structural error and presumed prejudice. *Ryan v. Palmateer*, 338 Or 278, 294-97, 108 P3d 1127, *cert den*, 546 US 874 (2005).

[6] *See United States v. Cronic*, 466 US 648, 659-60, 104 S Ct 2039, 80 L Ed 2d 657 (1984) (prejudice is presumed when criminal defense counsel fail to function in any meaningful sense as the government's adversary).

[7] *See, e.g., Jones v. Page*, 76 F3d 831, 844 (7th Cir), *cert den*, 519 US 951 (1996) (noting that "many competent defense attorneys" would recommend a guilty plea under certain circumstances); *U.S. v. Sampson*, 820 F Supp 2d 202, 228 (D Mass 2011) (strategy of recommending a guilty plea without agreement that government would not seek death penalty, while ultimately unsuccessful, "fell within the wide range of reasonable professional assistance"); *In re Elmore*, 162 Wash 2d 236, 256, 172 P3d 335, 346 (2007) (attorney's advice to plead guilty in a death penalty case was based upon reasonable trial strategy); *State v. Nash*, 143 Ariz 392, 399, 694 P2d 222, 229, *cert den*, 471 US 1143 (1985) (holding that pleading when the death penalty has not been waived is not presumptively ineffective assistance of counsel and that there "may be valid tactical reasons" for submitting a case); *cf. Hodges v. Colson*, 727 F3d 517, 534-37 (6th Cir 2013) (upholding state court determination that defense counsel was not deficient for advising client to plead guilty in capital case); *Post v. Bradshaw*, 621 F3d 406, 418 (6th Cir 2010), *cert den*, 131 S Ct 2902 (2011) (holding that no-contest plea was a reasonable tactic in death penalty case; "counsel were between a rock and a hard place in determining the best way to spare [the defendant from] a death sentence"); *Stenson v. Lambert*, 504 F3d 873, 890 (9th Cir 2007), *cert den*, 555 US 908 (2008) (attorney's decision to concede guilt in the sentencing phase of capital trial is not necessarily unreasonable).

*Florida v. Nixon*, 543 US 175, 125 S Ct 551, 160 L Ed 2d 565 (2004), albeit arising in a different procedural posture, corroborates such an approach. In that case, the petitioner, who had been sentenced to death, sought and obtained post-conviction relief from the Florida Supreme Court on the ground that trial counsel had conceded his guilt without his express consent. The United State Supreme Court reversed.

In the predicate criminal case in *Nixon*, there was overwhelming evidence—including a detailed confession— that the petitioner had kidnapped and brutally murdered a woman who gave him a ride after his car broke down, and prosecutors were unwilling to recommend a sentence other than death. Rather than contest the state's case, trial counsel decided to concede the petitioner's guilt in order to preserve credibility with the jury for the penalty phase. *Id.* at 179-81. Although trial counsel explained that decision to the petitioner several times, the petitioner neither verbally approved nor protested that decision. On post-conviction review, the Florida Supreme Court set aside the plea due to the lack of express consent to the concession strategy, reasoning that a concession of guilt requires the same level of consent as a formal guilty plea and that such an error is presumed to be prejudicial.

The United States Supreme Court reversed, holding that the petitioner's challenge was properly evaluated under *Strickland* and that an alleged failure by counsel to obtain a client's express consent to a strategy to concede guilt at the guilt phase of a capital trial does not automatically render that performance deficient. *Id.* at 189-93. In so holding, the Court discussed at length the strategic reasons for admitting guilt to a capital crime when the prosecution will not accept any plea bargain that removes the death penalty from the picture:

> "[T]he gravity of the potential sentence in a capital trial and the proceeding's two-phase structure vitally affect counsel's strategic calculus. Attorneys representing capital defendants face daunting challenges in developing trial strategies, not least because the defendant's guilt is often clear. Prosecutors are more likely to seek the death penalty, and to refuse to accept a plea to a life sentence, when the

evidence is overwhelming and the crime heinous. *In such cases, avoiding execution may be the best and only realistic result possible."*

*Id.* at 190-91 (internal citations and quotation marks omitted; emphasis added).

Noting that a strategy challenging the prosecution's case in the guilt phase can have dire implications for the sentencing phase, the Supreme Court concluded:

"Counsel therefore may reasonably decide to focus on the trial's penalty phase, at which time counsel's mission is to persuade the trier that his client's life should be spared. Unable to negotiate a guilty plea in exchange for a life sentence, defense counsel must strive at the guilt phase to avoid a counterproductive course. In this light, counsel cannot be deemed ineffective for attempting to impress the jury with his candor and his unwillingness to engage in a 'useless charade.' Renowned advocate Clarence Darrow, we note, famously employed a similar strategy as counsel for the youthful, cold-blooded killers Richard Loeb and Nathan Leopold."

*Id.* at 191-92 (internal citations omitted) (quoting *United States v. Cronic*, 466 US 648, 656 n 19, 104 S Ct 2039, 80 L Ed 2d 657 (1984)).[8]

Thus, depending on the totality of circumstances, acknowledging guilt *can* be a tenable capital defense strategy, especially where "the evidence is overwhelming and the crime heinous." *Nixon*, 543 US at 191. In such circumstances, advising a capital client to plead guilty where the state has not waived the death penalty may be a "tactically

---

[8] The "Leopold and Loeb" trial of 1924 was among the first billed as "the trial of the century." Nineteen-year-old Leopold and his friend, 18-year-old Loeb—both academically precocious and from prominent, extremely wealthy families—were charged with the brutal, "thrill-killing" of 14-year-old Bobby Franks. Within hours of their arrests, each confessed to kidnapping, albeit accusing the other of actually perpetrating the murder. Knowing that they would inevitably be condemned to death by a jury, Darrow surprised the prosecution when his clients pleaded guilty on the morning of the trial, shifting the sentencing decision to the judge alone. Darrow, a lifelong opponent of capital punishment, elicited psychiatric expert testimony to argue that Leopold and Loeb were so mentally abnormal that they could not be blamed for the murder. Ultimately, the court imposed life sentences for murder on each defendant. Loeb was killed by a fellow inmate in 1936, and Leopold was released on parole in 1958. Kevin Tierney, *Darrow: A Biography* 320-51 (1979).

advantageous" choice that falls within *Strickland*'s wide range of reasonable professional assistance. *Id.* at 187.[9]

It is also true, however, that, as the *Nixon* court noted, "pleading guilty without a guarantee that the prosecution will recommend a life sentence holds little if any benefit for the defendant" because it "relinquishes trial rights" and "increases the likelihood" that aggressive evidence of guilt will be introduced during the sentencing phase, "so that the gruesome details of the crime are fresh in the jurors' minds as they deliberate on the sentence." 543 US at 191 n 6. Those considerations inform and circumscribe, rather than categorically proscribe, the propriety of an unconditional plea.

Our conclusion that the plea strategy in this case is not *per se* unreasonable is also informed by the American Bar Association (ABA) standards, which the United States Supreme Court recognizes "are guides to determining what is reasonable, but they are *only* guides." *Strickland*, 466 US at 688 (emphasis added). The contemporaneous ABA Guidelines at the time of petitioner's plea provided, in relevant part:

> "In non-capital cases, the decision to enter a plea of guilty rests solely with the client. When the decision to plead guilty is likely to result in the client's death, however, counsel's position is unique. If no written guarantee can be obtained that death will not be imposed following a plea of guilty, counsel should be extremely reluctant to participate in a waiver of the client's trial rights. In California at least, a defendant cannot plead guilty over the objection of the attorney, giving counsel a tremendous responsibility for the client's life.
>
> "In other words, counsel must strive to convince a client to overcome natural emotional resistance to the idea of standing in open court and admitting guilt of what was

---

[9] Of course, a guilty plea is also "an event of signal significance in a criminal proceeding" which requires a defendant's affirmative, explicit acceptance in order to be valid—even "tacit acquiescence" is insufficient. *Nixon*, 543 US at 187-88. In that context, the Court in *Nixon* concluded that a concession of guilt is not the functional equivalent of a guilty plea and refused to extend that strict requirement to an attorney's concession of his client's guilt during the guilt phase of a capital trial. *Id.* at 188. The record here reflects that petitioner expressly consented to the guilty plea.

charged as a capital offense if that will save the client's life. Conversely, counsel must strive to prevent a (perhaps depressed or suicidal) client from pleading guilty where there is a likelihood that such a plea will result in a death sentence."

ABA, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases,* commentary to 11.6.3 (1989).[10] The gravamen of that guideline was, again, that, although an unconditional plea is exceptional in capital cases—that is, a tactic that counsel should be "extremely reluctant" to advise and participate in—there can be circumstances in which it is reasonable as being in the client's best interests.[11]

Having rejected petitioner's "categorical" theory, we proceed to the "as applied" approach: In the circumstances of this case, was it beyond the range of reasonable tactical choices to advise petitioner to plead guilty without the state's agreement not to seek the death penalty? Petitioner argues that trial counsel's strategy was ill-advised, that the process was rushed, and that he received no meaningful benefit in exchange for pleading guilty. The state counters that trial counsel provided reasonable justification for their advice and that the post-conviction court's findings and conclusions are supported by the record.

---

[10] *Strickland* requires that counsel's performance be evaluated in light of the "prevailing professional norms" and based on counsel's perspective "at the time." 466 US at 688-89. Petitioner entered his guilty plea on December 30, 1988, so we employ the inaugural, 1989 version of the ABA Guidelines because they best reflect the prevailing professional norms at that time. The current, revised standards do not depart from the 1989 Guidelines' approach to pleading a client guilty without a death penalty waiver. *See* ABA, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* 10.9.1-10.9.2 (2003).

[11] We note that the commentary to Guideline 11.6.2 (1989), pertaining to the content of plea negotiations, advise that counsel "should insist" that no plea "will be considered without a written guarantee * * * that death will not [b]e imposed." However, a footnote to that commentary cross-references a quotation from the Kentucky Public Advocate Death Penalty Manual, which "suggest[s]" that pleading a client guilty without a death penalty waiver "'is an effective strategy only when the attorney knows without any doubt that no death sentence will result. Any other "strategy" for entering a guilty plea is ill-advised and should be abandoned.'" (Underscoring in original.) Without expressing any view as to the narrowness of that underscored qualification, we observe, merely, that it contradicts a categorical proscription. Additionally, those passages are not included in the revised edition of the guidelines.

We conclude that the post-conviction court did not err in rejecting petitioner's "as applied" challenge. The post-conviction court's extensive factual findings—which petitioner does not contest—are well-supported by the record, and its conclusions are well-reasoned and legally sound.[12] Petitioner's appellate argument rests primarily upon selective excerpts of deposition testimony and, as we will explain, the inferences that he urges from that testimony are inconsistent with the record, as well as the post-conviction court's factual findings—particularly its credibility findings. Before addressing petitioner's specific arguments, however, we summarize the salient circumstances, as found by the post-conviction court, which underlay trial counsel's advice that petitioner plead guilty.

*First*, trial counsel, Woods and Dials, knew that the case against petitioner was overwhelming. Before he was arrested, petitioner not only confessed his guilt to friends on two separate occasions but also, once in custody, he gave police a detailed statement confessing to the murders. In his statement to the police, petitioner acknowledged that

> "[h]e and [his codefendant] Williams had recently been in California on a drug-related trip, during which Williams drove his pickup truck. They returned to Oregon on August 31. On their way back, but still in California, they picked up two young, foreign women hitchhiking their way north. While the women rode in the back of the pickup truck, Williams spoke with petitioner about robbing, raping, and shooting them. Williams stated that after robbing and raping them, shooting the victims would 'be easy.' Once in Oregon, Williams headed inland and began looking for an isolated place to rob and rape the women. Williams drove up a dirt road, ultimately finding a remote place near some power lines. Williams raped the smaller of the two women,

---

[12] The following findings and conclusions, some of which are set out above, *see* 267 Or App 654-57, bear on this matter: findings 1-2 (credibility); 3-24 (on the underlying crimes and the evidence, including multiple confessions); 27-33 (on trial strategy, the prosecution's position on the death penalty, plea negotiations and timing, plea conditions, and the guilty plea); 50-52 (general observations on post-conviction trial and petitioner's credibility); 53-56 (addressing allegations related to forensic investigation, competency to stand trial, police coercion, and admissibility of confessions); 61-62 (credibility); conclusions 63-64, 66 (general conclusions); 70-72 (forensics); 73-77 (competency); 78 (addressing "categorical" challenge); and 79-81 (concessions and tactical reasons for forgoing guilt phase).

later identified as Reith, while petitioner 'had fun' with the larger woman, identified as Tuxen. Williams bound the victims together with a rope. Williams then handed petitioner a sawed-off shotgun, which petitioner used to shoot both victims in the face. The victims were looking him in the eye when he shot them. He shot the 'little' victim first in the head, then shot the other, larger victim. On his way back to Williams' truck, petitioner found a package of English muffins and threw them off the side of the road into some brush. He and Williams then departed with the victims' possessions still in Williams' truck bed."

That confession was corroborated by the medical examiner's report, details from the crime scene, and evidence recovered from Williams's truck—and, based on petitioner's statements, the police were able to locate the murder weapon. In addition, petitioner made inculpatory statements to his attorneys, his girlfriend, and others. At no time during the original proceedings did petitioner ever give his attorneys any reason to doubt his confessions.

Given that overwhelming and irrefutable evidence that petitioner had murdered two victims after sadistically raping one of the women, and lacking a viable defense, counsel concluded that the chances of an acquittal were extremely low and that their efforts were better focused on avoiding the death penalty.[13] As Woods testified: "This was not a whodunit *** every bit of evidence that I remember was consistent with [petitioner's confessions]. *** [O]ur strategy shifted fairly early on to 'We've got to save this guy from the death penalty.'"

*Second,* there was no prospect of the state agreeing not to seek the death penalty. In 1988, there was no "true life" sentencing option; rather, at the time, the only possible sentences for aggravated murder were life imprisonment *with a possibility of parole* or a death sentence. Woods—a former Coos County district attorney who was very familiar with the prosecutors, the trial judge, and the tendencies

---

[13] Dials speculated that the defense should have contested deliberateness or presented a mental state defense, based on petitioner's long-time drug abuse and the fact that he was high on methamphetamine at the time of the murders. However, Woods ruled out that approach based on his experience with Coos County juries, who viewed drug use harshly, and might be more likely to impose the death penalty if the defense used petitioner's addiction to excuse his conduct.

of Coos County juries—knew that the state would seek the death penalty and would not bargain for a life sentence. Those circumstances led him to decide that "litigating petitioner's guilt would only serve to emphasize the brutality of the murders to the jury" and that pleading guilty was the best way to demonstrate remorse to the jury and attempt to shift the focus from the details of the crime to petitioner's story.[14]

*Third*, consistently with those goals, the plea agreement included a number of concessions, which trial counsel believed "increased the possibility that the jury would not impose the death sentence." The prosecution dismissed all charges except the two counts of aggravated murder, withdrew the state's motion for a jury view of the crime scene, and stipulated that petitioner gave a detailed, truthful confession to the police and that the murders "may well have remained unsolved" if not for petitioner's cooperation. The parties also agreed to allow two officers to give hearsay testimony in place of the live testimony of numerous witnesses, including two witnesses who saw petitioner with the victims just before the murders, a forensic expert, the victims' family members, and eight burglary victims.[15]

Petitioner's arguments challenging the reasonableness of the plea advice are based largely upon certain of Dials's statements during the post-conviction proceedings. However, the post-conviction court specifically discredited Dials's statements to the extent that they conflicted with Woods's testimony. For example, although petitioner highlights Dials's testimony that Dials disagreed with the decision to plead guilty and skipped the plea hearing "in protest" as evidence that the advice was unreasonable, that assertion is inconsistent not only with Woods's testimony, but also with Dials's own testimony. Woods testified that he

---

[14] The defense had planned for petitioner to testify during the penalty phase as part of the overall strategy to avoid the death penalty through demonstrating responsibility and remorse. Dials worked extensively to prepare petitioner to testify and was optimistic that petitioner would make a good witness. Then, on the day petitioner was set to testify, he refused and would not reconsider when pressed by his attorneys and the court.

[15] A number of those witnesses testified during the second and third penalty phase retrials, but not the first penalty phase proceeding.

was not aware of any disagreement over the plea agreement. When asked whether he agreed with Woods's assessment that the plea deal was a good idea, Dials responded that, although he had concerns with the strategy, he did not disagree with Woods—and, in fact, repeatedly defended the decision to plead petitioner guilty as the only way to make the jury realize that defendant had taken responsibility and deserved to be spared from death.[16]

Petitioner also invokes Woods's statement, from a 2009 affidavit, that he "thought [at the time of the plea] that entering the plea would persuade * * * [the state] into offering life imprisonment." Based on that statement, petitioner posits that "[f]orgoing a guilt phase trial on the vague hope that the state would drop the death penalty is not the actions of adequate or effective counsel." Whatever the validity, or accuracy, of Woods's recollection, 20 years after the operative events, it does not alter the contemporaneous circumstances, as found by the post-conviction court, that objectively justified counsel's advice, including the "enormous amount of evidence" of petitioner's guilt, the fact that the state was going to pursue the death penalty in all events, and the inclusion in the plea agreement of several concessions that the post-conviction court found "increased the possibility that the jury would not impose the death sentence."

In sum, given the horrific nature of the murders, the damning evidence of petitioner's guilt, the prosecution's refusal to bargain over the death penalty, and the inclusion of certain, potentially useful, concessions in the plea agreement, trial counsel's advice to plead guilty without a death penalty waiver did not amount to constitutionally inadequate assistance.

Finally, we briefly address petitioner's third challenge—viz., that trial counsel provided inadequate assistance by failing to inform him of the details of the plea agreement and

---

[16] In addition, Woods stated that, because Dials's office was out of town, Woods handled most of the appearances and that Dials's absence from the plea hearing was not notable. Dials confirmed in his testimony that Woods made court appearances and visited with the client more frequently—and acknowledged that, on the day of the plea hearing, he had a scheduling conflict that required him to be in Bend, and that he had decided to skip the plea hearing rather than cancel his other engagement.

the possible consequences of pleading guilty. *See Purdy v. U.S.*, 208 F3d 41, 44-45 (2d Cir 2000) (counsel should inform the defendant of the terms of the plea offer, the strengths and weakness of the case against him, and the alternative sentences to which he will most likely be exposed); *Gonzalez v. State of Oregon*, 340 Or 452, 457-58, 134 P3d 955 (2006) (counsel must inform client of the risks and consequences of a criminal plea, including the maximum and minimum possible sentences). That contention fails because it is premised entirely upon petitioner's own testimony during the post-conviction proceedings—testimony that the post-conviction court found to be wholly incredible.[17]

The post-conviction court properly denied post-conviction relief.

Affirmed.

---

[17] Given that petitioner, as the proponent of post-conviction relief, had the burden of proof and persuasion, the post-conviction court's rejection of his testimony is, by itself, dispositive. In addition, as the post-conviction court noted, that testimony conflicts with the record of the underlying criminal proceedings, with petitioner's prior statements, and with Woods's and Dials's accounts of the events.