**131 Nev., Advance Opinion 24**

# IN THE SUPREME COURT OF THE STATE OF NEVADA

IN THE MATTER OF L.A.W., A MINOR.

No. 63683

L.A.W.,
Appellant,
vs.
THE STATE OF NEVADA,
Respondent.



FILED

MAY 0 7 2015

TRACIE K. LINDEMAN
CLERK OF SUPREME COURT
BY_____
CHIEF DEPUTY CLERK

Appeal from a district court order adjudicating the minor appellant delinquent on one count of possession of a controlled substance with intent to sell. Eighth Judicial District Court, Family Court Division, Clark County; William O. Voy, Judge.

*Reversed and remanded.*

Philip J. Kohn, Public Defender, and Jennifer A. Fraser, Deputy Public Defender, Clark County,
for Appellant.

Adam Paul Laxalt, Attorney General, Carson City; Steven B. Wolfson, District Attorney, Jonathan E. VanBoskerck, Chief Deputy District Attorney, and Daniel Westmeyer, Deputy District Attorney, Clark County, for Respondent.

BEFORE PARRAGUIRRE, SAITTA and PICKERING, JJ.

15-13945

## OPINION

By the Court, PICKERING, J.:

This case presents the question of whether the State can condition a prospective minor student's access to public education on that student's waiver of his right to be free from unreasonable search and seizure under the Fourth Amendment of the Federal Constitution and Article 1, § 18 of Nevada's Constitution. The State claims that the student had educational options open to him that made his consent to random searches of his person and property in order to attend public high school in Las Vegas voluntary, but the record does not support this claim. We therefore reverse and remand to the district court with instructions that the court suppress any evidence resulting from the search of the minor, and to conduct any further proceedings accordingly.

### I.

Due to previous behavioral problems, the appellant, L.W., then a minor, was told he was being given a "last chance" to enroll in Legacy High School (Legacy) but only on a trial basis and on the condition that he sign a "Behavior Contract." Among other conditions, the Behavior Contract stipulated that:

> The following information lists the terms and conditions upon which [L.W.'s] enrollment in Legacy High School is based[:]
>
> . . . .
>
> 7. I realize that I am subject to random searches by school administration.

Both L.W. and his father signed the document.

The school's administration decided to conduct a search of all its trial enrollees. During the search of L.W., a Legacy teacher found $129

SUPREME COURT
OF
NEVADA

(O) 1947A

and a large plastic bag, containing two smaller bags with an eight-ball imprinted on them, each holding a "green, leafy substance." At the administration's direction, a campus police officer conducted a field test of the substance in one of the smaller bags, which came back positive for marijuana. The officer advised L.W. of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and, after questioning him, placed the boy under arrest.

The State charged L.W. with possession of a controlled substance with intent to sell. At a contested hearing on the charges against him, L.W. objected to the admission of evidence resulting from the search in question—specifically, testimony by the searching teacher and the campus police officer describing the fruits of the search, including statements that L.W. allegedly made explaining how he came to be holding the cash and baggies—but the Hearing Master declined to suppress on the grounds that L.W. had consented to the search via the Behavior Contract. Ultimately, the Hearing Master found that the "green leafy substance" was marijuana, that L.W. carried it with the intent to sell, and judged him guilty of the State's charge. The district court affirmed the Hearing Master's findings of fact, conclusions of law, and recommendations, and formally adjudicated L.W. a delinquent. L.W. appeals.

II.

In many ways, public schools act "in loco parentis," and school administrations are therefore granted certain authority, which "permit[s] a degree of supervision and control that could not be exercised over free adults." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 655 (1995). But this authority is not carte blanche, and "[i]t can hardly be argued

that . . . students . . . shed their constitutional rights . . . at the schoolhouse gate." *Robinson v. Bd. of Regents of E. Ky. Univ.*, 475 F.2d 707, 709 (6th Cir. 1973) (quoting *Tinker v. Des Moines Sch. Dist.*, 393 U.S. 503, 506 (1969)) (third alteration in original). Thus, a warrant- and suspicion-less search of a student, of the sort that the Legacy administration conducted upon L.W., is presumptively unreasonable, absent that student's consent (or other applicable exception, of which the State's briefing concedes there are none). *See New Jersey v. T.L.O.*, 469 U.S. 325, 341-42 (1985) (holding that a school's search of a student is reasonable if, at its inception, there are "reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school"); *State v. Ruscetta*, 123 Nev. 299, 302, 163 P.3d 451, 453-54 (2007) (holding warrantless searches presumptively unreasonable absent valid consent). To qualify, constitutionally speaking, such consent must be both intelligently and voluntarily given. *Ruscetta*, 123 Nev. at 302, 163 P.3d at 454.

Courts of other jurisdictions have held that the State cannot condition access to public education on a prospective student's renunciation of his right to be free from otherwise unconstitutional searches and seizures—even in the context of higher education—because, in light of the draconian result of a student's failure to give consent, such clauses amount to contracts of "adhesion" and therefore lack the requisite earmarks of intelligence and voluntariness. *Smyth v. Lubbers*, 398 F. Supp. 777, 788 (W.D. Mich. 1975); *see Robinson*, 475 F.2d at 709 ("[T]he state, in operating a public system of higher education, cannot condition attendance at one of its schools on the student's renunciation of his constitutional rights."); *Dixon v. Ala. State Bd. of Educ.*, 294 F.2d 150, 156

SUPREME COURT
OF
NEVADA

(O) 1947A

4

(5th Cir. 1961) (holding that a tax-supported college "cannot condition the granting of even a privilege upon the renunciation of the constitutional right to procedural due process"); *Morale v. Grigel*, 422 F. Supp. 988, 999 (D.N.H. 1976) (stating that a school could not condition a student's attendance upon a waiver of constitutional rights); *Moore v. Student Affairs Comm. of Troy State Univ.*, 284 F. Supp. 725, 729 (M.D. Ala. 1968) (recognizing that a college may not condition admission on a waiver of constitutional rights); *Devers v. S. Univ.*, 712 So. 2d 199, 206 (La. Ct. App. 1998) (noting the unconstitutionality of conditioning college dormitory occupancy on waiver of constitutional rights); *cf. Tinker*, 393 U.S. at 506 (noting that students retain First Amendment rights while attending school). But this reasoning does not pertain where a student seeks to pursue special activities beyond education because "[b]y choosing to 'go out for the team,'" or to engage in other voluntary, nonathletic activities, such students also "voluntarily subject themselves to a degree of regulation . . . higher than that imposed on students generally." *Vernonia*, 515 U.S. at 657. And so there is a line of cases wherein the United States Supreme Court has upheld random and suspicion-less searches of certain minor students as a condition of their participation in said extracurriculars. *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls*, 536 U.S. 822, 831 n.3, 834 (2002) (upholding drug testing of students who wished to participate in extracurricular activities); *Vernonia*, 515 U.S. at 664-65 (upholding random urinalysis requirement for participation in interscholastic athletics in schools).

The State argues that L.W.'s concession in his Behavior Contract—"I realize that I am subject to random searches by school administration"—amounted to his free and intelligent consent to

SUPREME COURT
OF
NEVADA

(O) 1947A

5

otherwise unconstitutional searches. According to the State, though "[L.W.] may have faced a difficult choice about whether to enroll in school, he had other options and was not forced into signing a behavior contract." And the existence of these "other options," the State argues, takes the circumstances of L.W.'s consent outside the rubric of *Robinson* and its progeny, and into the narrower class of cases exemplified by *Vernonia* and *Earls*.

Both *Vernonia* and *Earls* ultimately rest on the "special needs" exception to the Fourth Amendment's warrant requirement, *Earls*, 536 U.S. at 829, 836-37; *Vernonia*, 515 U.S. at 653, an exception that the State, in its briefing, confessed has no applicability here— "[A]dministrators were not relying on a special need exception to search [L.W.] in the instant case; they were relying on [his] consent." But even setting aside the State's waiver of the special needs exception, and *Vernonia* and *Earls'* poor fit to its remaining argument, *see Edwards v. Emperor's Garden Rest.*, 122 Nev. 317, 330, 130 P.3d 1280, 1288 (2006) (finding waiver of an argument where a party "neglected [its] responsibility to cogently argue" the issue), in terms of the availability of the "other options" the State claims were available to L.W., the record simply does not support their existence—the State did not proffer any such evidence before the juvenile Hearing Master or juvenile court, nor did the State make any argument on such grounds below; the juvenile Hearing Master likewise made no mention of the availability of alternative schooling to L.W. in its discussion of the supposed voluntariness of the consent to search. Indeed, the only mention in the appellate record of the availability of such "other options" to which the State can point is a statement by the juvenile court that, because of L.W.'s

SUPREME COURT
OF
NEVADA

(O) 1947A

6

age, "[h]e could have [gone] over to Adult Ed alternative school as an alternative at St. Louis."

This statement by the juvenile court appears to have been based upon its own understanding of Nevada's educational system and not upon any evidence presented by the State, as the full exchange demonstrates:

> THE COURT: He's seventeen. He could have [gone] over to Adult Ed alternative school as an alternative . . . .
>
> [L.W.'s counsel]: Yeah I'm not—I'm not sure about that. So—
>
> THE COURT: I am. Now, if he was sixteen your argument would be . . . stronger. But seventeen there are other options than going back to regular school.

And, the juvenile court judge's anecdotal assurance does not qualify as supporting evidence of the supposed educational options available to L.W. because it was neither "[g]enerally known within the territorial jurisdiction of the trial court," as L.W.'s counsel's uncertainty demonstrates, nor can we say it is "[c]apable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," because the district court made no mention of the sources he relied upon for such information. *See* NRS 47.130; *see also* NRS 47.150.

There being no meaningful evidence that L.W. had alternative public education available to him, the circumstances of his appeal differ from those of the students in either *Vernonia* and *Earls*—he asked for nothing more than *mere access* to a public education. Thus, and despite the State's arguments to the contrary, nothing sets L.W. apart from the public school student body as a whole; put differently, if the State may

condition L.W.'s access to public education upon his waiver of his constitutional right to be free from unreasonable search and seizure, it could seemingly do the same for *any* prospective public school student. This is an outcome that *Vernonia* and *Earls*, even assuming their pertinence in the context of consent searches, plainly do not sanction. *See Earls*, 536 U.S. at 830 (noting that the Court's opinions "did not simply authorize all school drug testing, but rather conducted a fact-specific balancing"); *Vernonia*, 515 U.S. at 665 (cautioning "against the assumption that suspicionless drug testing will readily pass constitutional muster in other contexts"). The facts of L.W.'s appeal thus fall squarely under the *Robinson* line of cases, wherein a state conditioned attendance at one of its schools on the student's renunciation of his or her constitutional rights.

Even admitting so, the State urges this court to ignore *Robinson,* et al., and instead follow an Oregon appellate court case, *State ex rel. Juvenile Dep't v. Stephens*, 27 P.3d 170 (Or. Ct. App. 2001), which holds inappositely. The circumstances of *Stephens* are undeniably similar to those at hand—a youth with behavioral problems signed a "Family/School Agreement," which included a clause whereby the youth agreed to "[s]ubmit to random searches of possessions, lockers, [and] person," as a condition of his enrollment in a "last chance" school. *Id.* at 172 (emphasis omitted). The Oregon Court of Appeals determined that the youth's acquiescence to that clause amounted to his constitutionally valid consent because he could have opted not to complete his education and was therefore not "obligated to attend [the school]." *See id.* at 174 (citing ORS 339.030, which provides exemptions from compulsory school attendance, as evidence of the lack of the youth's obligation). Thus,

SUPREME COURT
OF
NEVADA

(O) 1947A

8

according to the Oregon appellate court, the youth's circumstances in choosing to complete his public education were analogous to those "where, in exchange for a desired benefit, a citizen must agree to a search of his or her person or belongings." *Id.* (citing to *State v. Brownlie*, 941 P.2d 1069 (Or. Ct. App. 1997), wherein the same court held that a defendant's consent to x-ray screening of her purse could be inferred from her conduct in placing it on a conveyor belt at a courthouse, and *State v. Kelsey*, 679 P.2d 335 (Or. Ct. App. 1984), where it held that defendant impliedly consented to a pre-boarding search at terminal gate by attempting to board an airplane).

But, even assuming that a minor's access to public education is simply an amenity that can be likened to adults' access to courthouses and airplanes, it is not clear that the State may always condition its grant of some "desired benefit" upon an individual's waiver of a constitutional right. *See Cafeteria & Rest. Workers Union, Local 473, AFL-CIO v. McElroy*, 367 U.S. 886, 894 (1961) ("One may not have a constitutional right to go to Bagdad, but the Government may not prohibit one from going there unless by means consonant with due process of law." (internal quotations omitted)); *Dixon*, 294 F.2d at 156 (acknowledging that the fact that a right is not constitutionally protected does not necessarily excuse a failure of due process in the State's infringement thereupon). And, in fact, a minor's access to publicly funded education is not as easily analogized to those privileges as the Oregon appellate court suggests—while the Supreme Court has stopped short of naming the right to attend public school as one fundamental to citizenship, it has indicated that it views public education to be the foundation of meaningful democratic participation. *See Brown v. Bd. of Educ. of Topeka*, 347 U.S. 483, 493

(1954) *supplemented sub nom. Brown v. Bd. of Educ. of Topeka*, 349 U.S. 294 (1955). And this is because, according to the Court, public education is "a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment," so much so, in fact, that "it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education." *Id.* Thus, "the gift of a final chance in the public school system," to borrow the State's phrase, is in fact less luxury than necessity, and the improbability of a minor's future positive prospects absent any access to state sponsored education, indeed, the reality that he or she may never become a "good citizen" without it, *see id.*, draws into question whether a waiver of the constitutional right to be free from unreasonable search and seizure upon which such access is conditioned can ever be given "freely," as our precedent requires. *See Ruscetta*, 123 Nev. at 302, 163 P.3d at 453-54.

We are moreover mindful that a school administration's responsibility for "educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943). This seems especially true in the "last chance" context, where the young minds being given a "last chance" at a public high school education may also be those on the brink of entering into lifestyles antithetical to ordered society, for whom school administrators and campus police may be the most salient point of contact with the State. It is critical that such youth learn, through their interaction with these authority figures, that the State is fair, just, and

Supreme Court
OF
Nevada

(O) 1947A

10

trustworthy. *See* Ross L. Matsueda & Kevin Drakulich, *Perceptions of Criminal Injustice, Symbolic Racism, and Racial Politics*, 623 Annals Am. Acad. Pol. & Soc. Sci. 163, 164 (2009) ("If citizens view the system of justice [as untrustworthy], the social and political system is likely to be volatile and unstable."). A school administration's coercion of a child's "consent" to unconstitutional searches by holding the threat of closed educational doors over his or her head does not facilitate the desired perception of justice.

## III.

In light of these hefty considerations, we conclude that the State has failed to demonstrate that L.W.'s consent to search was voluntary—there was no record evidence that public education options beyond Legacy were available to him, and the State could not constitutionally condition L.W.'s access to a public education on his waiver of his right to be free from unreasonable search and seizure. The district court therefore should have suppressed the fruits of the administration's search of L.W., including, specifically, the testimony of the searching teacher and campus police officer. *See Torres v. State*, 131 Nev., Adv. Op. 2, 341 P.3d 652, 657 (2015) (noting that "[c]ourts must also exclude evidence obtained after the constitutional violation as 'indirect fruits of an illegal search or arrest'" (quoting *New York v. Harris*, 495 U.S. 14, 19

(1990))). Accordingly, we reverse and remand to the district court for proceedings consistent with this opinion.

_____, J.
Pickering

We concur:

_____, J.
Parraguirre

_____, J.
Saitta